223 A.2d 447.

ALLSTATE INSURANCE COMPANY *vs.* JUDITH S. FUSCO.

OCTOBER 28, 1966.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

Powers, J. This is an appeal from a judgment entered by a superior court justice pursuant to his decision that the uninsured automobile bodily injury benefit contained in the amendatory endorsement attached to a policy of automobile insurance issued by the plaintiff company to the defendant's deceased spouse is not recoverable in the circumstances established by the instant record.

It appears therefrom that on March 12, 1965, plaintiff, hereafter referred to as Allstate, delivered its "Crusader Policy," so called, providing automobile liability coverage to Ralph C. Fusco, then husband of defendant. By the terms of an amendatory endorsement it is provided:

"Section II—Protection Against Bodily Injury By Uninsured Automobiles

Coverage S—Bodily Injury Benefit Insurance Allstate will pay all sums which the insured shall be legally en-

titled to recover as damages from the owner or operator of an uninsured automobile because of bodily injury, sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such automobile."

The record further discloses that on March 27, 1965 said Ralph C. Fusco, hereafter called the decedent, was killed while riding as a passenger in an automobile owned and operated by Thomas J. Baumgardner who held a policy of liability insurance issued by another carrier, namely, Transamerica Insurance Company. The limits of Baumgardner's coverage, however, were $5,000 for any one person and $10,000 for any one accident. Allstate's Crusader Policy on the other hand provided for limits of $10,000 for injuries to any one person and $20,000 for any one accident.

The Crusader Policy, by the terms of the amendatory endorsement, made defendant beneficiary as surviving spouse and she made demands on Allstate for payment of the $5,000 differential between the basic limits of the two policies. Her claim was predicated on her contention that as to said differential Baumgardner was an "uninsured" motorist for whose negligence Allstate was required to respond in damages.

The defendant's claim being denied by Allstate, she proceeded to arbitration as required by the Crusader Policy when the parties could not agree. Taking the position that, because Baumgardner had liability coverage even though in a lesser sum than that provided in its Crusader Policy, the automobile in which decedent was killed was not "uninsured" as defined by Allstate and that in any event the position taken by defendant was not such as comes within the contemplation of the arbitration clause, Allstate initiated the instant proceedings. It sought thereby to enjoin defendant temporarily and permanently from pursuing her demand for arbitration as was the case in *American Universal Ins. Co.* v. *Costello,* 95 R. I. 191.

The cause was heard by a superior court justice on complaint, answer, replication and proof. Allstate conceded Baumgardner's negligence and the parties thereupon submitted to a determination by the court of the ultimate question, namely, was Baumgardner an "uninsured" motorist to the extent that his liability coverage with another company was less than that provided for in Allstate's policy issued to the decedent?

The parties further stipulated that the court should also determine the amount of damages for bodily injuries resulting in death provable by defendant in the event that it should be determined that the uninsured automobile coverage provided by Allstate's Crusader Policy was applicable to the $5,000 differential.

On the evidence offered by defendant, the trial justice found that the damages were in excess of the $10,000 limit but held that Baumgardner was not an "uninsured" motorist. The trial justice, in substance, based his decision on the definition of an "uninsured automobile" as set forth in Allstate's policy which in pertinent part reads as follows:

"4. 'uninsured automobile' means:

(a) an automobile with respect to the ownership, maintenance or use of which there is no bodily injury liability insurance applicable at the time of the accident with respect to any person or organization legally responsible for the use of such automobile * * *."

He concluded that "no bodily injury liability insurance" could not reasonably be construed to mean "insufficient bodily injury liability insurance" and ordered judgment entered for Allstate.

Appealing therefrom, defendant makes several contentions. The first of these is, in effect, that the trial justice misconceived and thus failed to take into consideration a

provision of the amendatory endorsement which reads as follows:

"If there is other insurance

"With respect to bodily injury sustained by any insured while occupying any automobile, other than one owned by the named insured, the insurance hereunder shall not apply if the owner of such automobile has insurance similar to that provided for herein.

"Subject to the preceding paragraph, if the insured has other similar insurance available to him, any damages shall be deemed not to exceed the higher of the applicable limits of the respective coverages, and such damages shall be pro-rated between such coverages in such proportion as each coverage bears to the total of such limits."

It is the thrust of defendant's contention with regard to the "other insurance" provision that the words "insurance similar" as set forth in the first paragraph mean similar in amount as well as the nature of the coverage. This, she argues, is clear from the repeated use of "similar" when used in connection with the prorating formula set forth in the second paragraph of the quoted provision.

We are in accord with her contention that the amount of coverage is included in the reference to "similar insurance," but she misconceives the nature of the coverage to which it refers, namely, bodily injury resulting from the negligence of an uninsured motorist. It would have meaning if, for example, the automobile in which the decedent was riding had been negligently struck by an uninsured automobile and Baumgardner carried insurance under which the decedent would have been included as an insured. In that event Allstate and Baumgardner's carrier, Transamerica Insurance Company, would prorate the damages for bodily injury sustained by the decedent and payable under the uninsured motorist provision of both policies.

Such, however, is not the situation here. It was Baumgardner's negligence which caused decedent's death and de-

fendant looked to Transamerica for damages resulting from the negligence of its insured under the liability provision of its policy. If this were not so, defendant would be in the anomolous position of claiming two thirds of her damages under Allstate's policy and but one third from Transamerica whose liability for Baumgardner's negligence was total within the limit of its policy delivered to the latter.

The defendant, however, makes an additional and we believe meritorious contention that Allstate's definition must be construed in the light of the public policy mandated by the legislature and binding on insurance carriers licensed to do business in this state.

On March 12, 1965 when the policy in question was delivered to the decedent, G. L. 1956, §27-7-2.1, enacted by P. L. 1962, chap. 161, expressly provided that a contract of automobile liability insurance delivered or issued for delivery to a motorist in this state should include the right to recover damages for bodily injury resulting from the negligence of an uninsured motorist. Moreover, said section by reference specifically provided for a minimum limit of liability. When the policy in question was delivered to decedent on March 12, 1965 the required minimum limits were $10,000 for any one person and $20,000 for any one accident. This legislative declaration of minimum limits became effective January 1, 1965 with the enactment of P. L. 1964, chap. 171, and is now G. L. 1956, §31-31-7, as amended.

Legislative requirement of financial responsibility as a condition precedent to the operation of motor vehicles on the public highways of the state is a valid exercise of the police power. *Berberian* v. *Lussier*, 87 R. I. 226. In this state the general assembly in its wisdom has refrained from enacting compulsory insurance legislation except in certain instances with which we are not here concerned. It has, however, deemed it advisable in the public interest to re-

quire insurance carriers authorized to do business in this state to provide protection against the negligent operation of uninsured automobiles in favor of those motorists who voluntarily contract with licensed carriers for liability coverage in the interests of the public generally. Furthermore, the general assembly has specified the minimum limits for which said carriers will be liable in an appropriate case.

It is well settled that where the lawmaking power speaks on a particular subject over which it has constitutional power to legislate, public policy in such a case is what the statute enacts. *Chicago, Burlington & Quincy R.R.* v. *McGuire*, 219 U. S. 549; *Parchen* v. *Chessman*, 49 Mont. 326. Thus contracts of insurance carriers must conform to constitutionally valid conditions imposed by the legislature. *Whitfield* v. *Aetna Life Ins. Co.*, 205 U. S. 489.

We therefore think that, by legislative intendment as set forth in the cited statutes, "no bodily injury liability insurance applicable at the time of the accident" as the same appears in Allstate's definition of an uninsured automobile must as a matter of public policy be construed to include any differential between liability insurance carried by the tortfeasor and the minimum limits mandated by the legislature. Allstate freely admits that it would be liable in the sum of $10,000 if Baumgardner had carried no insurance whatsoever, but argues in effect that liability insurance carried by Baumgardner in an amount less than that mandated by the legislature constitutes some insurance and thus by the terms of its definition, notwithstanding the legislative fiat, is relieved of all obligation to its insured. We cannot agree.

In support of her contention that Allstate's definition of an uninsured automobile as set forth in the amendatory endorsement is subject to legislative modification, defendant cites several cases, including *Cruzado* v. *Underwood*, 39 Misc.2d 859 (N.Y.), *Fireman's Fund Indemnity Co.* v. *In-*

*dustrial Accident Comm.*, 226 Cal. App.2d 676, 678, *Hardin* v. *American Mutual Fire Ins. Co.*, 261 N. C. 67, *Southern* v. *Lumbermens Mutual Casualty Co.*, W.D. Va., 236 F. Supp. 370, and *Taylor* v. *Preferred Risk Mutual Ins. Co.*, 225 Cal. App.2d 80.

Allstate, in rebuttal, argues that these cases are not in point for the reason that in every instance the court was confronted with a legislative definition of "uninsured automobile." A careful reading of the cited cases, however, establishes that the distinctions upon which Allstate relies are based on syntax rather than substance. Thus, the applicable Virginia statute stressed by Allstate as a typical distinction is as follows: "* * * and the term '*uninsured motor vehicle*' means a motor vehicle as to which there is no (i) bodily injury liability insurance and property damage liability insurance both in the amounts specified by §46.1-1 (8), as amended from time to time * * *." Code of Virginia 1950, as amended, §38.1-381 (c).

Clearly this is merely another way of saying that an automobile not insured for bodily injury liability in minimum limits established by the legislature is an uninsured automobile. We have no hesitancy therefore in concluding that by virtue of the appropriate statutes prevailing on March 12, 1965 when Allstate's policy was delivered and March 27, 1965, the date of the accident in which the decedent was killed, Baumgardner was operating an uninsured automobile to the extent that the bodily insurance liability limits carried by him were less than the $10,000/$20,000 mandated by the general assembly.

However, subsequent to the enactment of P. L. 1964, chap. 171, the registrar of motor vehicles advised all licensed carriers as follows:

"On January 1, 1965, the Rhode Island State Law will require that an Automobile Insurance Policy, in order to meet the requirements under the bodily injury provision, must provide limits of $10,000 and $20,000.

"After a study of House Bill 1176 as approved by the Legislature and signed into law by Governor Chafee on May 7, 1964, the Registry has decided that said Bill affects limits only on policies to be issued on or after January 1, 1965.

"In other words, all policies issued after January 1, 1965 must be issued with minimum limits of $10,000/$20,000. All filings at the Registry on policies issued prior to January 1, 1965 will maintain the old limits until the respective expiration dates of the policies governing said filings."

This, Allstate argues, is a legal opinion on the strength of which it was entitled to assume that, on January 1, 1965 and thereafter until such policies as that delivered to Baumgardner had expired, all such policies would constitute financial responsibility within the intendment of the legislative mandate.

Whatever bookkeeping, accounting or mechanical problems the registrar may have intended to spare insurance carriers licensed to do business in this state, he could not by any reasonable construction of his rule-making powers impair the substantive rights of insureds who had negotiated with such carriers after January 1, 1965.

The defendant's appeal is sustained, the judgment appealed from is reversed, and the cause is remanded to the superior court with direction to enter judgment in accordance with this opinion and for further proceedings.

*Charles H. Anderson*, for plaintiff.

*Tillinghast, Collins & Tanner, DeWitte T. Kersh, Jr.*, for defendant.