Sharon GLEASON, David Gleason, Kelly Gleason, Francis P. Gleason, and Patricia Gleason, Plaintiffs,

v.

MERCHANTS MUTUAL INSURANCE COMPANY, Defendants.

Civ. A. No. 83–0694 S.

United States District Court,
D. Rhode Island.

June 20, 1984.

Oleary & McElroy, Michael R. McElroy, Providence, R.I., for plaintiffs.

Hanson, Curran & Parks, A. Lauriston Parks, Seth E. Bowerman, Providence, R.I., for defendants.

## OPINION

SELYA, District Judge.

This matter involves an action brought by five related plaintiffs: Francis P. Gleason and his wife, Patricia Gleason (collectively, the grandparents); their son and daughter-in-law, David and Sharon Gleason; and Kelly Gleason, infant daughter of Mr. and Mrs. David Gleason. The grandparents, at the times material hereto, were the named insureds in and under a certain automobile insurance policy (policy) issued by the defendant, Merchants Mutual Insurance Company (MM). Jurisdiction is bottomed on diversity of citizenship and the existence of a controversy in the requisite amount. 28 U.S.C. § 1332.

After discovery had been undertaken, MM filed a motion for summary judgment as to all claims of all plaintiffs. That motion was accompanied, inter alia, by the statement of undisputed material facts required by Local Rule 12.1 of this court. The motion also relied upon a stipulation of record (Stipulation) entered on January 19, 1984, explicating the pertinent terms of the policy. The plaintiffs, while objecting to the motion, have in their Local Rule 12.1 cross statement admitted each and all of the facts so advanced by the defendant, *id.* at ¶ 1, and have set forth certain further items (as to which MM has expressed no disagreement). Thus, the facts underlying this dispute are, for purposes of the instant motion, uncontroverted.

Subsequent to the submission of amplitudinous briefs, oral arguments were heard on May 23, 1984. Decision was reserved.

## I. *Factual Predicate*

A decurtate articulation of the material facts is in order. In or about May of 1980, MM issued its policy to the grandparents. A number of vehicles were described therein, including a 1964 Oldsmobile owned by Patricia Gleason. When the policy issued, and at all other relevant times, the grandparents made their home at 11 Harding St., West Warwick, Rhode Island. By November of 1980, David and Sharon had set up housekeeping separate and apart from the grandparents at an abode in Coventry, Rhode Island. Kelly had been conceived, but not yet born. The policy remained in full force as of November 5, 1980.

On that date, Sharon Gleason, who was beginning her eighth month of pregnancy, sojourned forth in the Oldsmobile to visit her in-laws. Neither Sharon nor her husband owned any cars on November 5, 1980. Whilst travelling on Main Street in West Warwick, the automobile exhausted its supply of gasoline and ground to a halt. Sharon got out of the car, crossed the street to a nearby pizzeria, and telephoned her father-in-law for assistance. After doing so, she left the restaurant and began crossing the street to return to the car. Sharon was four or five feet from the driver's door of the Oldsmobile when an oncoming vehicle driven by one Julie Turner (concededly, an uninsured motorist) bore down upon her. The Turner vehicle swerved, narrowly avoided hitting Sharon, and crashed unceremoniously into the rear of the parked Oldsmobile. Sharon claims, understandly, to have been emotionally shaken by the near miss and to have experienced various untoward physical manifestations of her distress. Two weeks later she delivered a premature baby, namely, the plaintiff Kelly Gleason. It is alleged that Kelly has suffered from the effects of prenatal injuries referable to the events of November 5.

On the day after the incident, Sharon and her in-laws went to the office of an MM agent to report the event and to file a claim. They say they were told that coverage was lacking; therefore, no claims were proffered. About two years later, having received advice of counsel in the interim, the plaintiffs did make claim for injuries allegedly sustained and for expenses and damages supposedly incurred. Those advances were quite brusquely rejected by the insurer, and the instant litigation ensued.

## II. *Contentions of the Parties*

It is clear from the various documents of record, *e.g.*, the plaintiffs' complaint, the attorney's demand letters to the insurers annexed thereto, and the plaintiffs' Local Rule 12.1 cross statement, that the "claims" asserted to MM were personal injury claims arising under the uninsured motorist part of the policy: for Sharon's emotional distress and damages ancillary thereto; for physical injuries allegedly resulting to Kelly in consequence of harm sustained while *en ventre sa mere;* and for David's loss of consortium and of the services of his wife and child, as well as expenses incurred or to be incurred by him in his dual capacity as husband and father, respectively, of the injured parties. There is no suggestion of the promulgation of any claim by Patricia for property damage inflicted upon the Oldsmobile.[1]

The essence of uninsured motorist coverage is that the insurer, where the provision attaches, stands in the shoes of the non-covered tortfeasor for purposes of liability. And, under Rhode Island law, it cannot be gainsaid that an individual like Sharon, who was well within the zone of direct personal jeopardy and who has averred adverse physical symptoms proximately caused by her harrowing emotional experience, would have a viable cause of action against the negligent driver responsible for her predicament and its consequences. *See, e.g., Plummer v. Abbott Laboratories*, 568 F.Supp. 920, 922–26 (D.R.I.1983) (collecting and reviewing Rhode Island cases). It is

---

**1.** Indeed, the policy documents (which are of record) appear to show no collision coverage for the Oldsmobile; and the uninsured motorist protection, if applicable, has a $200.00 per claim deductible, R.I.Gen.Laws § 27–7–2.1, which likely exceeded the fair market value of Patricia's seventeen year old vehicle at the time of the accident. More to the point, plaintiffs' counsel has neither briefed nor argued any such claim.

equally well settled that prenatal injuries, negligently inflicted, would in such circumstances be actionable in tort. *Sylvia v. Gobeille*, 101 R.I. 76, 220 A.2d 222 (1966).

The plaintiffs' complaint starts with these premises, and proceeds to limn a trilogy of putative causes of action. Count I culminates in the imprecation that MM's conduct toward the plaintiffs "constitutes wrongful and bad faith refusal to pay a legitimate insurance claim," Complaint at ¶ 23, and is therefore actionable under the benefices of R.I.Gen.Laws § 9–1–33.[2] Count II posits a somewhat imaginative assertion that the same conduct is also actionable as a "tortious breach of contract." Complaint at ¶ 25. Count III can be read to make out the uninsured motorist claim which lies at the core of this dispute, but it is couched in vitriolic hyperbole which suggests, mayhap, that the plaintiffs are suing MM not in its role as a surrogate for Turner, but for *independently* inflicting emotional harm on the plaintiffs by its processing and ultimate denial of their claims. *E.g., id.* at ¶ 27 ("Merchants' conduct was willful, wanton and in reckless disregard of the emotional trauma it would inflict upon the plaintiffs.").

MM denies that the grandparents, qua policyholders, have sustained any actionable injury; and denies that the remaining plaintiffs are, the premises considered, entitled to the succor of the policy. Further, it defends its conduct in the handling of the claims as reasonable, and attempts to brush aside any imputation of bad faith.

Despite the harsh stridulations which permeate the plaintiffs' complaint, and the peculiar manner in which counsel has opted to plead the case, one point is clear: if MM had no coverage applicable to the incident of November 5, 1980, then, in the last words of the bard's epic drama of the melancholy Dane: "The rest is silence." W. Shakespeare, *Hamlet*, Act V, scene 2, line 372 (1603). If the insurer had no legal obligation under the policy to honor or to pay the proffered claims, then its corporate behavior in denying them—no matter how rude or unseemly—could scarcely be a predicate for the causes of action echoed in the complaint. Indeed, the Rhode Island courts have gone further, indicating that "if a claim is *'fairly debatable'*, no liability in tort [for bad faith] will arise." *Bibeault v. Hanover Insurance Co.*, 417 A.2d 313, 319 (R.I.1980) (emphasis added). Surely, the greater must include the lesser; and if an immunity attaches to an insurer's turndown of a "fairly debatable" claim, the vaccine must be even more potent when the claim is found to be baseless.

And, if further support were needed for what seems to be an abecedarian and self-evident concept, this view is buttressed by the recent decision of the First Circuit in *Voccio v. Reliance Insurance Companies*, 703 F.2d 1 (1st Cir.1983) (applying Rhode Island law). There, Judge Breyer focused on the bottom line nature of bad faith claims. *Id.* at 3–4. The case at bar fits snugly within that integument—for if the Gleasons had no cause(s) of action against MM to begin with, their predictable bottom line was zero, and the perceived disdain with which they were treated by the insurer is immaterial. In that event, *uberrima fides* would not have brought about a different outcome. It follows inexorably, as the night overtakes the day, that any duty on MM's part must be rooted in the insurance contract. Elsewise, the remaining contentions of the Gleason family are as insubstantial as a house built upon the shifting sand.

**2.** R.I.Gen.Laws § 9–1–33(a) provides in pertinent part as follows:

Notwithstanding any law to the contrary, an insured under any insurance policy as set out in the general laws or otherwise may bring an action against the insurer issuing said policy, when it is alleged said insurer wrongfully and in bad faith refused to pay or settle a claim made pursuant to the provisions of said policy, or otherwise wrongfully and in bad faith refused to timely perform its obligations under said contract of insurance. In any action brought pursuant to this section, an insured may also make claim for compensatory damages, punitive damages and reasonable attorney fees.... the question of whether or not an insurer has acted in bad faith in refusing to settle a claim shall be a question to be determined by the trier of fact.

**1478**

### III. *Policy Provisions*

To place the fact pattern of the case into appropriate context, the court must briefly review the relevant terms, conditions, and insuring agreements contained in the policy. The parties, by their mutual assent to the Stipulation, have greatly simplified this chore.

Leaving aside for the time being the plaintiffs' argument for statutory reformation of the policy, *see* text *post* (Part VII (B)), the contract establishes two prerequisites with respect to bodily injury: such injury must be "caused by accident" and must be "sustained by a covered person." The controversy here swirls around the latter half of this tandem. As the parties have agreed, the policy defines the phrase "covered person" to mean:

1. You or any family member.
2. Any other person occupying your covered auto.
3. Any person for damages that person is entitled to recover because of bodily injury to which this coverage applies sustained by a person described in 1. or 2. above.

Stipulation at 1.

In turn, the term "family member" is defined as follows:

"Family member" means a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child.

*Id.* at 1–2.

Lastly, the word "occupying," as used in the policy generally and for the purpose of ascertaining who may be a "covered person," is ascribed the following signification:

"Occupying" means in, upon, getting in, on, out or off.

*Id.* at 2.

### IV. *Applicable Law*

Sitting in diversity jurisdiction (and the parties—having agreed on little else of legal consequence—concur that the forum state's law controls), this court must determine whether, given the enumerated facts, coverage has attached under Rhode Island law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Lyons v. Salve Regina College*, 565 F.2d 200, 202 (1st Cir.1977); *Montaup Electric Co. v. Ohio Brass Corp.*, 561 F.Supp. 740, 744 (D.R.I.1983); *Scuncio Motors, Inc. v. Subaru of New England, Inc.*, 555 F.Supp. 1121, 1124 (D.R.I.1982), *aff'd*, 715 F.2d 10 (1st Cir.1983). The court must, in that regard, "make an informed prophecy as to the meaning and effect" of the policy provisions and of the applicable statutes. *Scuncio*, 555 F.Supp. at 1124. The case at bar comes before the court in precisely the same posture as *Plummer, supra*, where this court defined the task at hand in the following verbiage:

Since there are no Rhode Island cases directly on point, it is this court's task to vaticinate what the decision of the Rhode Island Supreme Court would be were that court faced with the issue. In undertaking this forecast, the court must look to relevant, i.e., analogous, state court decisions, and may assay sister state adjudications of the issue. Once the law is divined in accordance with these principles, the court must apply conventional summary judgment standards to the pending Rule 56 motion; and must satisfy itself as to whether or not the movants have demonstrated entitlement to judgment as a matter of law.

*Plummer*, 568 F.Supp. at 921–22 (citations omitted).

### V. *The Summary Judgment Standard*

As MM's motion is brought under the aegis of Fed.R.Civ.P. 56, the court is constrained by the regimen of that rule. The standard to be applied is by now solidly embedded in federal jurisprudence. It was recently synopsized by this court in *Gonsalves v. Alpine Country Club*, 563 F.Supp. 1283, 1285 (D.R.I.1983), *aff'd*, 727 F.2d 27 (1st Cir.1984):

It is well settled that summary judgment can be granted only where there is no genuine issue as to any material fact and where the movant is entitled to judgment as a matter of law. *Emery v. Merrimack Valley Wood Products, Inc.*, 701 F.2d 985, 986 (1st Cir.1983); *Hahn v.*

*Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *United Nuclear Corp. v. Cannon,* 553 F.Supp. 1220, 1226 (D.R.I.1982); *Milene Music, Inc. v. Gotauco,* 551 F.Supp. 1288, 1292 (D.R.I. 1982). In determining whether these conditions have been met, the Court must view the record in the light most favorable to the party opposing the motion, *Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d at 986; *John Sanderson & Co. (WOOL) Pty. Ltd. v. Ludlow Jute Co.,* 569 F.2d 696, 698 (1st Cir.1978), indulging all inferences favorable to that party. *Santoni v. Federal Deposit Insurance Corp.,* 677 F.2d 174, 177 (1st Cir.1982); *O'Neill v. Dell Publishing Co.,* 630 F.2d 685, 686 (1st Cir. 1980).

With these preliminary thoughts firmly in mind, the court now turns to the merits.

## VI. *The Claims of Francis and Patricia Gleason*

■ The instant motion is susceptible to facile disposition insofar as the grandparents are concerned. Neither of them was involved in any way in the accident of November 5, 1980. Neither of them was a witness to it, nor a person within the zone of danger at the time of its occurrence. Neither of them has alleged or displayed any corporeal manifestations of mental anguish related to the events in question. Thus, under Rhode Island law, neither grandparent would have any independently actionable claim against Turner (the uninsured motorist). *See, e.g., Plummer, supra,* and cases collected therein. A fortiori, no such claim lies on their behoof against the insurer under the uninsured motorist protection afforded by their policy with MM.

■ Nor do either of the grandparents assert a viable derivative claim against Turner: their son, David, was not injured in the mishap (and, in any event, was at the time an adult and, for aught that appears, emancipated); they are not in loco parentis as to either their daughter-in-law (Sharon) or their granddaughter (Kelly); and they do not allege economic loss (such as the

incurring of health care expenses) growing out of the injuries purportedly sustained by those plaintiffs. Thus, they cannot claim vicariously against MM.

Moreover, Patricia, the registered owner of the car, does not press in this forum any claim against MM for bumps and bruises to her Oldsmobile. *See* text & n. 1, *ante.* And, neither she nor her husband so much as hints at any other rational predicate upon which their claim for relief against MM could be founded. True, the policy was purchased by Francis and Patricia, and they are the sole named insureds therein. But this happenstance, naked and unadorned, cannot confer standing to sue in the utter absence of a cause of action. Though these plaintiffs may chafe at the perceived indignities which the insurer has, in their view, so callously wrought upon members of their family, the resultant pruritis cannot, without more, be scratched by the federal judiciary. *Cf. Duffy v. Quattrocchi,* 576 F.Supp. 336, 342 (D.R.I. 1983).

When quizzed on this point at oral argument, plaintiffs' counsel responded in the most nebulous of terms. The court was left with the distinct impression that the inclusion of the grandparents as parties plaintiff in this suit rested on nothing more substantial than the merest velleity. It is said that hope springs eternal; but litigation premised on hope alone need not last eternally. There are, as to both Francis and Patricia, no genuine issues of material fact; and MM is plainly entitled to judgment against them as a matter of law.

## VII. *The Claims of Sharon, David, and Kelly Gleason*

■ The assertions of the three remaining plaintiffs (Sharon, David and Kelly) admittedly present a much nicer set of questions. Because Sharon and David had established their own home prior to the happening of the subject accident, and were no longer residents of the grandparents' household at the key moment, neither of them was entitled to coverage as a "family member" within the policy definition (quoted *ante* at Part III). Kelly, still *in utero*

on November 5, 1980, is in no better position. Thus, liability is dependent in the first instance on whether Sharon and Kelly were entitled to coverage under the alternate definition of covered persons as "person(s) occupying [the] covered auto." [3] If they were, David would be entitled to recover damages consequent to their injuries under section 3 of the "covered person" rubric (likewise quoted *ante* at Part III). Inasmuch as the answer to this inquiry depends entirely on whether Sharon was "occupying" the Oldsmobile when Turner's unfortunate motoring transpired, the court will discuss Sharon's claim alone—but cognizant, withal, that David and Kelly swim or sink with her.

Sharon advances two primary arguments in support of her coverage claim. She asserverates, first, that the policy should, on these facts, be interpreted so as to invoke its protection in her circumstances by its very terms. Alternatively, she maintains that if such is not the case, then the mandate of R.I.Gen.Laws § 27–7–2.1 (quoted *post* at n. 5) commands nonetheless that the policy be so construed. The court will treat with these two lines of attack seriatim.

### A. *Construction of the Policy*

The principles applicable to the construction of a policy of insurance subject to Rhode Island law are well settled. An appropriate statement of the guiding rules was set forth in *Malo v. Aetna Casualty and Surety Co.*, 459 A.2d 954, 956 (R.I. 1983):

> In interpreting the contested terms of the insurance policy, we are bound by the rules established for the construction of contracts generally. *Colagiovanni v. Metropolitan Life Insurance Co.*, 57 R.I. 486, 190 A. 459 (1937). The language used in the policy must be given its plain, ordinary, and usual meaning. *Bush v. Nationwide Mutual Insurance Co.*, R.I., 448 A.2d 782 (1982); *Hughes v. American Universal Insurance Co.*, R.I., 423 A.2d 1171 (1980); *Elliott Leases Cars, Inc. v. Quigley*, 118 R.I. 321, 373

A.2d 810 (1977). When the terms are found to be clear and unambiguous, the task of judicial construction is at an end. The contract terms must then be applied as written and the parties are bound by them. *Bush v. Nationwide Mutual Insurance Co.*, R.I., 448 A.2d 782 (1982); *Hughes v. American Universal Insurance Co.*, R.I. 423 A.2d 1171 (1980); *Factory Mutual Liability Insurance Co. of America v. Cooper*, 106 R.I. 632, 262 A.2d 370 (1970).

The reverse side of the insurance coin is, of course, that "when the language employed by an insurer is ambiguous or susceptible to one or more reasonable interpretations, it will be strictly construed against the insurer." *Goucher v. John Hancock Mutual Life Insurance Co.*, 113 R.I. 672, 681, 324 A.2d 657, 662 (1974). *See also Nagy v. Lumbermens Mutual Casualty Co.*, 100 R.I. 734, 740, 219 A.2d 396, 400 (1966); *Bennett Chevrolet Co. v. Bankers & Shippers Insurance Co.*, 58 R.I. 16, 19, 190 A. 863, 864 (1937). The test to be applied is not what the insurer may have intended, but what the ordinary insured, unskilled in the parlance of the industry, would reasonably have understood. *Elliott Leases Cars, Inc. v. Quigley*, 118 R.I. 321, 325–26, 373 A.2d 810, 812 (1977). Thus, the threshold question becomes whether or not ambiguity lurks within the interstices of the policy.

At first blush, MM's position appears unassailable. The definition of "occupying" is not hedged in by legalistic gobbledygook, but is in plain and simple English. Indeed, it is difficult to hypothesize how the insurer could more lucidly have defined the acts in question. In everyday usage, "getting in" is tantamount to "entering"; and Sharon was four or five steps shy of entering the parked vehicle when the incident occurred.

The plaintiffs would have the court equate "getting in" with "approaching"; but this would, in effect, require a judge-made redrafting of the policy. Courts should refrain from conjuring up

---

**3.** MM concedes that Patricia's 1964 Oldsmobile was one of three or four vehicles specifically described in the policy and was therefore a "covered auto." Stipulation at 1.

ambiguities when none exist and from saddling insurance carriers with liabilities not fairly imposed by the insurance contract. *McGowan v. Connecticut General Life Insurance Co.*, 110 R.I. 17, 19, 289 A.2d 428, 429 (1972). The courts must abjure unnecessary mental gymnastics which give the terms of the policy a forced or distorted construction. *Cf. Bush v. Nationwide Mutual Insurance Co.*, 448 A.2d 782, 784 (R.I. 1982). This case, in respect to the clarity of the policy language at issue, is a sister under the skin to cases such as *Malo* and *Bush,* both *supra,* and the policy provisions should be accorded their plain, ordinary, usual and literal meaning.

Such a view is bolstered by an analysis of caselaw from other jurisdictions. In *New Amsterdam Casualty Co. v. Fromer,* 75 A.2d 645 (D.C.1950), plaintiff brought a claim under the medical payments clause of his insurance policy. The policy limited his right to medical payments for injuries sustained while "in or upon, entering or alighting from ... the automobile." *Id.* at 646. Plaintiff had pulled to the curb, exited from his vehicle, walked to a nearby automobile, and begun to walk back to his car to resume operation. When he was less than six feet away, he was struck by a third vehicle and injured. The plaintiff maintained that he was "entering" his car at the time of the accident and entitled to coverage. But, the *Fromer* court stated that the words "in or upon, entering or alighting," were plain, unambiguous, and deserving of their ordinary meaning; accordingly, it was held that, since "entering" means "going into; passing into the interior of; passing within the outer cover or shell of; penetrating; [or] piercing," coverage would not lie. *Id.* at 647–48.

To like effect is *Ross v. Protective Indemnity Co.*, 135 Conn. 150, 62 A.2d 340 (1948), which addressed medical payments coverage language identical to that in *Fromer.* The *Ross* plaintiffs, returning

from a trip, had stopped by the side of the road and departed their vehicle (presumably in some haste) to urinate, intending to resume their journey once nature's call had been answered and relief had been obtained. While micturating at the roadside, they were struck by another vehicle. The court exhibited little difficulty in rejecting the contention that the plaintiffs were entitled to coverage. According to the *Ross* court, a finding that the plaintiffs were entering or alighting from the car would require "so distorting [the words] as to accord a meaning other than that evidently intended by the parties". *Id.* at 153, 62 A.2d at 341.

The same result was reached in *Jarvis v. Pennsylvania Threshermen & Farmers' Mutual Casualty Insurance Co.*, 244 N.C. 691, 94 S.E.2d 843 (1956), where the plaintiff was walking back to his truck when he was struck and killed. *See also Carter v. Travelers Indemnity Co.*, 146 So.2d 257 (La.1962). *Cf. Goodwin v. Lumbermens Mutual Casualty Co.*, 199 Md. 121, 132, 85 A.2d 759, 764 (1952). *See generally* Annot., 42 A.L.R.3d 501 (1969).

Sharon claims that this case is controlled by *Sherman v. New York Casualty Co.*, 78 R.I. 393, 82 A.2d 839 (1951). But *Sherman,* fairly read, offers more solace to MM than to the Gleasons. In *Sherman,* the Rhode Island Supreme Court construed the phrase "in or upon" a motor vehicle to apply to an motorist who, although outside of his vehicle, was in "immediate and substantial contact," that is to say, *actual physical contact,* with the car at the time of the accident. 78 R.I. at 397, 82 A.2d at 841. That is a situation which is readily distinguishable from the case at bar, where Sharon was two yards distant at the moment of truth. And, the *Sherman* court cited both *Fromer* and *Ross. Sherman,* 78 R.I. at 399, 82 A.2d at 842. While distinguishing both, *id.* at 399–400, 82 A.2d at 842, it displayed no disapproval of either.[4]

**4.** Sharon also trumpets a "vehicle orientation" theory in support of her argument that the reach of the contested coverage extends to one in her position. *E.g., Sentry Insurance Co. v. Providence Washington Insurance Co.*, 91 Wis.2d 457, 283 N.W.2d 455 (1979). The gist of this

theory is that, in some cases, a person will be considered to be "occupying" a vehicle upon exiting it, if she remains in the immediate vicinity of the car at the time of the accident. *Id.*, 91 Wis.2d at 460, 283 N.W.2d at 457. *See also Allstate Insurance Co. v. Flaumenbaum,* 308

Nor is Sharon's claim a compelling one on public policy grounds. If "getting in" means, as Sharon says, "approaching," then it must mean "approaching with the intention of entering." This would, in turn, lead to a pass where the putative insured's subjective intentions would govern. True, she was but four or five feet away at the time; but, to carry her argument to its inevitable extreme, coverage would inhere on the same rationale if she was fifty feet away, a mile or two away, a continent away—so long as she claimed to be en route to her car. That would be an absurd and inequitable extension of coverage and would grotesquely deform the scope of the policy's embrace. Fundamental fairness demands that MM not be placed in that bearhug when its policy has not invited such a result.

### B. *Statutory Reformation*

Sharon has yet another string to her bow. She contends that, even if the court rejects her interpretation of the disputed policy language on its merits, Rhode Island's statutory insurance scheme nevertheless requires that coverage be afforded to her in the circumstances of this case. This asseveration prescinds from the explicit directive of the Rhode Island General Assembly mandating that uninsured motorist protection be offered to policyholders. The statute at issue, R.I.Gen.Laws § 27–7–2.1, is reproduced in its entirety in the margin.[5] There is, of course, no question but that contracts of insurance must conform to valid conditions imposed by a state legislature. *E.g., Whitfield v. Aetna Life*

*Insurance Co.*, 205 U.S. 489, 494–96, 27 S.Ct. 578, 579–80, 51 L.Ed. 895 (1907). In such a case, the statute essentially becomes a part of the policy with like effect as if inscribed in the contract. *Id.* Indeed, should the express language of a policy clause conflict with the legislature's sense of the public weal as expressed by statute, the former must yield to the latter. *Id.* at 500, 27 S.Ct. at 581; *see also Pickering v. American Employers Insurance Co.*, 109 R.I. 143, 152–53, 282 A.2d 584, 589–90 (1971); *Allstate Insurance Co. v. Fusco*, 101 R.I. 350, 356, 223 A.2d 447, 450–51 (1966).

As the highest court of the state is acknowledged to be the "best authority" on state law, *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967), this court seeks guidance in the construction of § 27–7–2.1 which the Rhode Island Supreme Court has announced in its decided cases.

Since the enactment of the compulsory offer statute in its original form in 1962, the Rhode Island judiciary has generally adopted a liberal construction of the law's purposes and effect. *E.g., Pickering, supra; Fusco, supra.* Thus, in *Aldcroft v. Fidelity and Casualty Co. of New York*, 106 R.I. 311, 321, 259 A.2d 408, 415 (1969), the court held that

[t]he legislature ... enacted this statute for the purpose of providing, as a matter of public policy, protection of the named insured in policies to be issued for protec-

N.Y.S.2d 447, 62 Misc.2d 32 (1970). The long and the short of this contention is that Rhode Island has shown no signs of embracing such a theorem; the facts of this case can be differentiated with ease from the facts of the cases which espouse the view; and, if "intention" is, as the plaintiffs urge, the pivotal factor in determining "vehicle orientation," then the lid of Pandora's jar is hoisted high. *See* text *post.*

**5.** Section 27–7–2.1 reads as follows:

No policy insuring against loss resulting from liability imposed by law for property damage caused by collision, bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for deliv-

ery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in limits for property damage caused by collision, bodily injury or death set forth in § 31–31–7 as amended, under provisions approved by the insurance commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and hit-and-run motor vehicles because of property damage, bodily injury, sickness or disease, including death, resulting therefrom, provided that the named insured shall have the right to reject such coverage, or that portion thereof that applies to property damage.

tion against financial loss resulting from the operation of uninsured motor vehicles.

But, that liberality knows some bounds. So, in *Employers' Fire Insurance Co. v. Baker*, 119 R.I. 734, 383 A.2d 1005 (1978), the Rhode Island Supreme Court, in a situation conceptually analogous to that at bar, upheld the validity of a policy exclusion defining "persons insured" in the face of a § 27–7–2.1 challenge. *Id.* at 741–42, 383 A.2d at 1008–09. And more recently, in *Malo v. Aetna Casualty and Surety Co., supra*, the state supreme court had the opportunity to consider if the exclusion of a person from uninsured motorist coverage under his mother's automobile insurance contract contravened public policy under § 27–7–2.1. In *Malo*, Chief Justice Bevilacqua, writing for a unanimous court, noted that

> [n]either the terms of the statute nor the public policy expressed therein mandates what class of persons must be extended coverage, nor do they disallow any restriction on that class. Rather, the designation of what persons are insured for purposes of this statute is left to the terms of the particular insurance policy. According to the clear and unambiguous terms of plaintiff's mother's policy, plaintiff is specifically excluded from coverage.... Restriction of this extended coverage ... is not unreasonable and does not negate the intent of the Legislature.

*Id.,* 459 A.2d at 956–57.

█ *Malo* and *Baker* are controlling here. The Rhode Island courts have consistently interpreted § 27–7–2.1 to provide *policyholders* with optimum coverage. At the same time, however, the state supreme court has been chary of extending coverage to other persons in the face of clear and explicit contract provisions to the contrary. While the blanket protection of the uninsured motorist clause is tucked snugly about the purchaser of a policy of motor vehicle insurance issued in Rhode Island, the insurer retains considerable say in determining which other persons can slip beneath the coverlet. So here: Sharon is not a named insured; and MM's extension of

any coverage to her is governed not by the statute, but by the terms of its policy. Her entitlement to benefits as an omnibus insured stands or falls on the language of the contract; and, as noted above, *see* text *ante* (Part VII (A)), she is four or five steps short of the reach of the insuring agreement.

## VIII.  *Conclusion*

Based upon the foregoing, the defendant has successfully met the criteria of Fed.R. Civ.P. 56. There is no genuine issue as to any material fact, and MM is entitled to judgment in its favor as a matter of law as to all claims asserted by the several plaintiffs. The defendant's motion for brevis disposition must be, and it hereby is, granted.

*It is so ordered.*