Patricia J. McINNIS, plaintiff,

v.

**HARLEY-DAVIDSON MOTOR COMPANY, INC. and A.M.F., Inc., defendants,**

v.

**Florence POIRIER, a/k/a Florence Hrosfowyc, third-party defendant.**

Civ. A. No. 82–0422–S.

United States District Court, D. Rhode Island.

Jan. 14, 1986.

McKinnon & Harwood, John B. Harwood, Daniel V. McKinnon, Pawtucket, R.I., Jones & Aisenberg, Martin W. Aisenberg, Providence, R.I., for plaintiff.

Higgins, Cavanagh & Cooney, Gerald C. DeMaria, Robert J. Quigley, Jr., Providence, R.I., for defendants.

Hinckley, Allen, Tobin & Silverstein, Paul V. Curcio, Gerald J. Petros, Providence, R.I., for third-party defendant.

## OPINION AND ORDER

SELYA, District Judge.

This case, in its present posture, poses a question of first impression under Rhode Island law. An explication follows.

### I. BACKGROUND

On April 16, 1982, the plaintiff, Patricia McInnis, was driving a motorcycle manufactured by the defendant Harley-Davidson Motor Company, Inc. (H–D).[1] She collided with a private passenger automobile driven by the third-party defendant, Florence Poirier. McInnis sustained grievous injuries, including the loss of her left leg.

In November of 1981, McInnis settled her chose in action against the adverse operator, Poirier, for $60,000. She executed a general release (a copy of which is annexed hereto as Appendix A). McInnis then filed suit against H–D, asseverating that the clutch housing of the motorcycle had been negligently designed and was defective and unsafe. She claimed that this defect, rather than (or in combination with) Poirier's careless driving, caused the severance of her limb. (The clutch housing shattered and the plaintiff alleges that a jagged edge inflicted the injury which led to the amputation.) H–D subsequently filed a third-party complaint seeking contribution from Poirier as a joint tortfeasor. *See* R.I. Gen. Laws §§ 10–6–1 to 10–6–11 (1985).

The primary case was tried to a jury in this court, Chief Judge Boyle presiding. The jury returned a general verdict in favor of H–D, and the plaintiff appealed. The First Circuit, finding error in the admission of evidence, vacated the judgment and mandated a new trial. *McInnis v. A.M.F., Inc.*, 765 F.2d 240 (1st Cir.1985) (*McInnis I*). Following remand, the case was reassigned to a new trier in pursuance

---

1. H–D is a wholly-owned subsidiary of the defendant A.M.F., Inc. Inasmuch as both defendants stand in precisely the same shoes vis-a-vis the point at issue, the court will from time to time refer to H–D as if it was the sole defendant in the action (but the court's comments are, unless otherwise noted, equally applicable to A.M.F., Inc.).

of D.R.I.L.R. 7(g) ("When an appellate court remands a case to this court for a new trial, the case shall be reassigned to a judge other than the judge before whom the first trial was held.").

The defendants had, during the early stages of the litigation, sought summary judgment based on the execution and delivery of the release to Poirier. Judge Boyle withheld any pretrial ruling on the motion. During trial, the defendants moved for a directed verdict on this ground; decision was reserved. After the jury verdict, H–D renewed the motion; Judge Boyle denied it as moot. The defendants cross-appealed on this ground, but the court of appeals, noting that the trial judge "never reached the difficult legal issues" pertaining to the effect of the release, declined to resolve the conundrum. *McInnis I*, 765 F.2d at 252.

## II. THE PENDING MOTIONS

In the wake of the remand, the legal effect of the general release became the cynosure of all eyes. A smorgasbord of incremental motions ensued. Two of these, each brought under Fed.R.Civ.P. 56, are now before the court, viz:

1. H–D moves for *brevis* disposition in its favor, asserting that McInnis's release of "Florence Poirier and all other persons, firms or corporations," *see* Appendix A, had the force, as a matter of law, of discharging its liability to the plaintiff.

2. McInnis cross-moves for partial summary judgment in her favor on the release issue, urging that, as a matter of law, the release discharged only Poirier and did not inure to the benefit of H–D.

On November 27, 1985, a chambers conference was held to consider the desirability of certification of the underlying legal question to the state supreme court pursuant to Rhode Island Supreme Court Rule 6. (The First Circuit expressly invited consideration of such a course of action. *McInnis I*, 765 F.2d at 252 n. 12.) The parties to the case, who agree on little else, were unanimous in their opposition to certification. They lamented, particularly, the delay inherent in the process. The court is not unsympathetic to their perceived plight.

Where, as here, the signals semaphored by a state tribunal are not completely tenebrous, courts should be slow to certify questions over the unremitting objections of all parties in interest. *E.g., Rhode Island Chapter of the National Women's Political Caucus, Inc. v. Rhode Island Lottery Commission,* 609 F.Supp. 1403, 1411 (D.R.I.1985); *cf. Ciba-Geigy Corp. v. Local #2548, United Textile Workers of America, AFL–CIO,* 391 F.Supp. 287, 297 n. 10 (D.R.I.1975) (abstention disfavored where the parties mutually deplore such a course and where abstention, if imposed unilaterally by the court, would exact a high price from the litigants). Under these circumstances, the court has determined to undertake direct decision of the pending motions.

Oral argument was waived by all parties at the November 27 conference. But, the issue has been plethorically briefed.

## III. DIVINING STATE LAW

This court, sitting in diversity jurisdiction, must determine the effect of the general release executed by McInnis under Rhode Island law. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir. 1977); *Gleason v. Merchants Mutual Insurance Co.,* 589 F.Supp. 1474, 1478 (D.R.I. 1984); *Plummer v. Abbott Laboratories,* 568 F.Supp. 920, 921 (D.R.I.1983); *Scuncio Motors, Inc. v. Subaru of New England, Inc.,* 555 F.Supp. 1121, 1124 (D.R.I.1982), *aff'd,* 715 F.2d 10 (1st Cir.1983). The Rhode Island Supreme Court has never confronted "the troublesome question of whether, without more, a release of 'all persons, firms and corporations' is effective to release unnamed third persons not parties to the release." *Lennon v. MacGregor,* 423 A.2d 820, 821 n. 1 (R.I. 1980). To the contrary, the state's highest tribunal has twice expressly declined opportunities to decide the question because the particular cases which touched upon the issue did not squarely raise it. *See id.; Julian v. Zayre Corp.,* 120 R.I. 494, 388

A.2d 813, 815 (1978). Yet, the tea leaves can be read in this instance with surprising clarity. This court believes that it has been provided with sufficient guidance to enable it confidently to fulfill its "obligation to make an informed prophecy as to the meaning and effect" of the applicable state law. *Scuncio*, 555 F.Supp. at 1124.

In another case involving an unsettled question of Rhode Island tort law, this court staked out the perimeters of its task as follows:

> This court, sitting in diversity jurisdiction, must determine whether the enumerated facts combine to state a cause of action for negligent infliction of emotional distress under Rhode Island law. Since there are no Rhode Island cases directly on point, it is this court's task to vaticinate what the decision of the Rhode Island Supreme Court would be were that court faced with the issue. In undertaking this forecast, the court must look to relevant, i.e., analogous, state court decisions, and may assay sister state adjudications of the issue. Once the law is divined in accordance with these principles, the court must apply conventional summary judgment standards to the pending Rule 56 motion; and must satisfy itself as to whether or not the movants have demonstrated entitlement to judgment as a matter of law.

*Plummer*, 568 F.Supp. at 921–22 (citations omitted).

These, then, are the channel markers which this court must follow in charting its course on the release question.

## IV. THE SUMMARY JUDGMENT STANDARD

As the motions sub judice have all been brought pursuant to Fed.R.Civ.P. 56, "the court is constrained by the regimen of that rule." *Gleason*, 589 F.Supp. at 1478. The summary judgment standard is far easier to articulate than to apply:

> It is well settled that summary judgment can be granted only where there is no genuine issue as to any material fact and where the movant is entitled to judgment as a matter of law. *Emery v. Merrimack Valley Wood Products, Inc.*, 701 F.2d 985, 986 (1st Cir.1983); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *United Nuclear Corp. v. Cannon*, 553 F.Supp. 1220, 1226 (D.R.I.1982); *Milene Music, Inc. v. Gotauco*, 551 F.Supp. 1288, 1292 (D.R.I. 1982). In determining whether these conditions have been met, the Court must view the record in the light most favorable to the party opposing the motion, *Emery v. Merrimack Valley Wood Products, Inc.*, 701 F.2d at 986; *John Sanderson & Co. (WOOL) Pty. Ltd. v. Ludlow Jute Co.*, 569 F.2d 696, 698 (1st Cir.1978), indulging all inferences favorable to that party. *Santoni v. Federal Deposit Insurance Corp.*, 677 F.2d 174, 177 (1st Cir.1982); *O'Neill v. Dell Publishing Co.*, 630 F.2d 685, 686 (1st Cir. 1980).

*Gonsalves v. Alpine Country Club*, 563 F.Supp. 1283, 1285 (D.R.I.1983), *aff'd*, 727 F.2d 27 (1st Cir.1984). *See also Advance Financial Corp. v. Isla Rica Sales, Inc.*, 747 F.2d 21, 26–27 (1st Cir.1984); *Gleason*, 589 F.Supp. at 1478–79. As the First Circuit has noted, "summary judgment is a judicial device available only when the effluent stream of controversy has been purified by the exclusion of any genuine issues of material fact." *General Electric Co. v. United States Dynamics, Inc.*, 403 F.2d 933, 934 (1st Cir.1968).

In the case at bar, the statements of material fact filed by the parties in compliance with their respective obligations under D.R.I.L.R. 12.1(a) have measurably simplified the court's task.[2] And, at least to the

---

**2.** Local Rule 12.1(a) of this court provides in material part as follows:

(a) *Statement of undisputed facts and statement of genuine issues.*

  (1) With each motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, the moving party shall serve and file ... a concise statement of all material facts as to which he contends there is no genuine issue necessary to be litigated.

  (2) Any party opposing a motion shall serve and file ... a concise statement of all material

extent limned in Part I *ante,* the basic facts are not controverted.

## V. THE HEART OF THE MATTER

H–D's motion for summary judgment squarely presents the first pivotal issue before the court at this juncture: whether, as a matter of law, a general release procured by one joint tortfeasor and purporting to discharge not only the named releasee but "all other persons, firms or corporations" suffices to acquit all unnamed joint tortfeasors of liability to the releasor. If so, the case is over. If not, then McInnis's motion implicates the second pivotal question: what effect, if any, does the execution and delivery of such an instrument have on claims subsequently pressed against an unnamed joint tortfeasor?

The court starts with the premise that the named releasee (Poirier) and the movant (H–D) are joint tortfeasors vis-a-vis McInnis. The First Circuit has ruled as a matter of Rhode Island law that Poirier and H–D "are indeed joint tortfeasors with regard to any injury that was in fact caused by the shattering of the clutch housing." *McInnis I,* 765 F.2d at 250. It follows inexorably that these parties "are jointly and severally liable if they are both the legal cause of harm that cannot be apportioned, whether [their] conduct is concurring or consecutive." *Id. (citing* Restatement (Second) of Torts § 879).

An examination of the law of other jurisdictions indicates that there are fully four views as to whether the release of one particular joint tortfeasor, coupled with a boilerplate release of the world at large, discharges other joint tortfeasors. The traditional common law rule provided that the discharge of one tortfeasor was a complete surrender of any cause of action against any other joint tortfeasor, regardless of the terms of the release. This hoary doctrine is still in place in certain jurisdictions. *E.g., Haney v. Cheatham,* 8 Wash.2d 310,

111 P.2d 1003 (1941); *Bland v. Warwickshire Corp.,* 160 Va. 131, 168 S.E. 443 (1933). Notwithstanding the continued fidelity of a handful of its proponents, this singleminded view has been debunked by a majority of commentators and rejected by most legislatures and courts. *See generally* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts,* § 49 at 332–35 & n. 19 (5th ed.1984) (hereinafter *"Prosser"*) (criticizing common law rule); *McKenna v. Austin,* 134 F.2d 659, 662 (D.C.Cir.1943).

The shortcomings of the traditional rule are readily apparent. In *McKenna,* Judge (later Justice) Rutledge exploded the myth in telling terms:

> The rule's results are incongruous. More often than otherwise they are unjust and unintended. Wrongdoers who do not make or share in making reparation are discharged, while one willing to right the wrong and no more guilty bears the whole loss. Compromise is stifled, first, by inviting all to wait for the others to settle and, second, because claimants cannot accept less than full indemnity from one when doing that discharges all. Many, not knowing this, accept less only to find later they have walked into a trap. The rule shortchanges the claimant or overcharges the person who settles.... Finally, it is anomalous in legal theory, giving tortfeasors an advantage wholly inconsistent with the nature of their liability.

*Id.* at 662 (footnote omitted).

The Rhode Island General Assembly has clearly repudiated this relic of a bygone era by enacting a version of the Uniform Contribution Among Joint Tortfeasors Act (UCJTA), now codified as R.I.Gen.Laws §§ 10–6–1 to 10–6–11 (1985). (Rhode Island initially adopted the UCJTA in 1940; the parties concede that it governs this

facts as to which he contends there is a genuine issue necessary to be litigated.

Local Rule 12.1(d) is also relevant:

(d) *Uncontroverted facts.* In determining any motion for summary judgment, the court may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are controverted by affidavit filed in opposition to the motion, or by other evidentiary materials which the court may consider under Rule 56 of the Federal Rules of Civil Procedure.

case.) The applicable state statute, § 10–6–7, provides in relevant part:

A release by the injured person of one (1) joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides.

The enactment of § 10–6–7 resolves the first (and simplest) inquiry. It is perfectly plain that Rhode Island has abjured the common law rule, so that the settlement with Poirier did not ipso facto extinguish any claim by McInnis against other joint tortfeasors. But in those jurisdictions which have chosen to abrogate the traditional dogma, variety has flowered.[3] Indeed, a trichotomy of viewpoints has developed where a single tortfeasor bargains for and receives a discharge which purports to acquit her and "all other persons, firms or corporations." Even a recognition of such rampant diversity tends to understate the complexity of the problem, for there are several variations on each of these three themes. To cite but one example, some statutes bar liability for contribution among joint tortfeasors and others do not. *Compare* Ill.Rev.Stat. ch. 70, § 302(d) (1979) (discharging releasee from all liabili-

ty for contribution) *with* R.I.Gen.Laws § 10–6–8 (1985) (discharging releasee from liability for contribution only in limited circumstances).

The easiest of the three postulates to administer is that for which H–D argues in this case. There is respectable authority for the view that a release discharging "all other persons, firms or corporations" satisfies the language of the UCJTA, *e.g.*, R.I. Gen.Laws § 10–6–7, thereby barring a plaintiff from proceeding against unnamed joint tortfeasors. *See, e.g., Douglas v. United States Tobacco Co.*, 670 F.2d 791, 793–95 (8th Cir.1982) (applying Arkansas law); *Morison v. General Motors Corp.*, 428 F.2d 952, 953–54 (5th Cir.1970) (same); *Battle v. Clanton*, 27 N.C.App. 616, 220 S.E.2d 97, 99 (1975); *Hasselrode v. Gnagey*, 404 Pa. 549, 172 A.2d 764, 765 (1961).[4]

The second haven to which courts have fled in an effort to solve this tangram is the "specific identity" rule. Courts which have trod this path have given the statutory language "unless the release so provides" a narrow construction. In such a perspective, the release of one tortfeasor does not discharge other joint tortfeasors

---

**3.** According to a compilation in the Uniform Laws Annotated, twenty-one jurisdictions have adopted some version of the UCJTA. *See* Uniform Contribution Among Joint Tortfeasors Act, 12 U.L.A. 64 (Supp.1985). At least one jurisdiction, however, has adopted the Act without including any variation of the specific provision regarding the effect of a release. *See Breed v. Peck*, 28 N.J. 351, 146 A.2d 665, 672 (1958). This court's research has unearthed three jurisdictions not included in the compilation which have passed statutes virtually identical to R.I. Gen. Laws § 10–6–7. *See Manos v. Trans World Airlines, Inc.*, 295 F.Supp. 1166, 1169 (N.D.Ill. 1968) (applying Cal.Civ.Proc.Code § 877(a) (West 1980)); *Alsup v. Firestone Tire & Rubber Co.*, 101 Ill.2d 196, 77 Ill.Dec. 738, 461 N.E.2d 361, 363 (1984) (applying Ill.Rev.Stat. ch. 70, § 302(c) (1979)); *Sage v. Hale*, 75 Misc.2d 256, 347 N.Y.S.2d 416, 418 (N.Y.Sup.Ct.1973) (applying N.Y.Gen.Oblig. Law § 15–108 (McKinney 1978)).

**4.** Several other cases are often cited as supporting this rule, but in this court's view those cases are ambiguous. In *Peters v. Butler*, 253 Md. 7, 251 A.2d 600, 602–03 (1969), the Maryland Court of Appeals, while appearing to preclude

the plaintiff's suit as a matter of law, nonetheless proceeded to evaluate extrinsic evidence of the parties' intent. A subsequent federal district court decision relied on *Peters* in order to bar the plaintiff's suit, but failed to note the state court's bifurcated approach. *Stefan v. Chrysler Corp.*, 472 F.Supp. 262 (D.Md.1979), *aff'd*, 622 F.2d 587 (4th Cir.1980). Similarly, the New Mexico Court of Appeals barred a plaintiff's suit against an unnamed joint tortfeasor, but noted that its analysis was limited to the four corners of the release because claimant had failed to seek reformation of the release in the trial court on the ground that it did not reflect the intention of the parties. *Johnson v. City of Las Cruces*, 86 N.M. 196, 521 P.2d 1037, 1037 (Ct.App.1974). Indeed, even *Battle* can be seen as distinguishable. In that case the North Carolina Court of Appeals emphasized that in addition to the clause purporting to discharge the whole world, the release also contained language indicating that it was executed to preclude further or additional claims arising out of the accident. *Battle*, 220 S.E.2d at 99. Because of these circumstances, the court views the Maryland and New Mexico precedents as weak support, at best, for the flat bar rule, and considers the North Carolina precedent as suspect.

unless the latter are named in the release or otherwise specifically identifiable from the face of the instrument. *See, e.g., Alsup v. Firestone Tire & Rubber Co.*, 101 Ill.2d 196, 77 Ill.Dec. 738, 740–41, 461 N.E.2d 361, 363–64 (1984); *Sage v. Hale*, 75 Misc.2d 356, 347 N.Y.S.2d 416, 418 (N.Y. Sup.Ct.1973); *Beck v. Cianchetti*, 1 Ohio St.3d 231, 439 N.E.2d 417, 420 (1982). The precise formulation of what constitutes "specific" identification varies from jurisdiction to jurisdiction, but all courts which follow this route agree that naming a releasee meets the requirement; and, short of naming, the party must be referred to in the document in such a way that his identity is made manifest.

These courts also choose somewhat different policy arguments in support of the specific identity rule; the Ohio court, for example, makes mention of the relative positions of the parties and indicates that the defendant has the burden of showing that the plaintiff understood the release and intended to discharge the unnamed tortfeasors. *See Beck*, 439 N.E.2d at 420. The instant plaintiff, not surprisingly, exhorts that Rhode Island would select this alternative. (The parties seem to agree that the release taken by Poirier, *see* Appendix A, is insufficient within its four corners to permit identification of H–D.)

The third furculum travelled by the courts is a line of reasoning which holds that while a boilerplate discharge of the world at large within a release does not necessarily suffice to acquit unnamed joint tortfeasors, it will serve that purpose if and to the extent that the parties between whom the release was negotiated so intended. *See, e.g., Sellon v. General Motors Corp.*, 521 F.Supp. 978, 983–84 (D.Del. 1981); *Manos v. Trans World Airlines, Inc.*, 295 F.Supp. 1166, 1169–70 (N.D.Ill. 1968) (applying California law); *Hurt v. Leatherby Insurance Co.*, 380 So.2d 432, 433–34 (Fla.1980); *cf. Harris v. Grizzle*, 599 P.2d 580, 585–86 (Wyo.1979) (dealing with a release of "any claims" as opposed to a release of "all persons, firms or corporations"). The "intent" rule, in a sense, is a synthesis of the triumvirate of rules.

Whereas the flat bar rule presumes that the releasor meant to discharge the world, and the "specific identity" rule presumes that the releasor intended only to discharge those persons or entities who are designated in, or discernible from, the instrument, the "intent" rule abandons both of these fictions and permits the actual intent of the parties to control.

The spoor which emanates from Rhode Island's highest court strongly suggests that, under Rhode Island law, a general release discharges unnamed joint tortfeasors only if the parties to the release—in this case, McInnis and Poirier—intended that result. The Rhode Island Supreme Court's decision in *Lennon v. MacGregor*, 423 A.2d 820 (R.I.1980), is particularly instructive. There, the court held that where an instrument purports to release unnamed "persons, firms and corporations" but also contains a covenant of indemnification, "an ambiguity is created which can only be resolved by a trier of fact." *Id.* at 822–23. Extrinsic evidence of the intent of the parties therefore is appropriate when "two provisions are in apparent conflict and give rise to different interpretations." *Id.* at 822. Though H–D sees this language as a holding that, in the absence of an indemnity clause, extrinsic evidence is outlawed, close perscrutation of *Lennon* reduces that assessment to the status of a mere velleity.

The *Lennon* court, 423 A.2d at 821 n. 1, quoted with apparent approval Justice Musmanno's dissent in *Hasselrode v. Gnagey*, 172 A.2d at 765 (Musmanno, J., dissenting), an opinion which condemned in no uncertain terms the position which H–D advocates here:

> [The unnamed tortfeasor] seeks to take advantage of some stray words in the release which have no more relation to the defendant than the hieroglyphics on some prehistoric sarcophagus buried in the subterranean depths of Egypt.
>
> It is not claimed by anyone that the [joint tortfeasor] has done one single thing which entitles it to be released from a responsibility which attaches to

every other vehicle owner involved in a serious accident. In spite of all this the [joint tortfeasor],—by its superficial appraisement of certain words in the agreement, by a failure to look beneath the moth-eaten phrases of that stereotyped form so as to ascertain the true intention of the parties, by a determination to take the advantage of the syllable and not the spirit, by letter and not by law,—is now on the way to coming into a windfall....

*Id.* at 767.

This court tramples no virgin terrain in its conclusion that *Lennon* points toward the adoption of an intent rule. The court of appeals, too, apparently reads the state law roadmap in much the same fashion. Citing *Lennon,* the First Circuit has emphasized that "Rhode Island cases on releases in general support the view that a release of one party does not release unidentified third parties, at most holding the matter to be one of intent of the signatories." *Day v. J. Brendan Wynne, D.O., Inc.,* 702 F.2d 10, 12 (1st Cir.1983). And, the court of appeals indicated its belief that the Rhode Island Supreme Court will no longer tolerate "[t]he older general view, giving comprehensive consequence to a general release, [which] would regard the [joint tortfeasor] as a beneficiary." *Id.* To be sure, the First Circuit panel made these statements in a case which involved a general release discharging the "payor ... from all claims and demands arising out of ... an accident," *see id.* at 11, rather than one which discharged "all other persons, firms or corporations." Yet, this distinction seems more cosmetic than real. The reasoning of *Day* lends strong support to an expansive vision of *Lennon.*

Also pertinent to the point is another, more recent, First Circuit decision which construed Rhode Island principles of law governing releases. In that case, the instrument stated that both the defendant and the defendant's insurer were discharged from "all and any manner of actions." *Hashway v. Ciba-Geigy Corp.,* 755 F.2d 209, 210 (1st Cir.1985). The district court granted summary judgment for the employer-defendant. The court of appeals reversed. It found the plaintiff had not intended to discharge the defendant from employment claims that were unrelated to worker's compensation. *Id.* at 211. Conceptually, there is scant difference between going behind the stock language of a release of "all actions" to pinpoint which actions were within the contemplation of the parties, and going behind the boilerplate verbiage of a release of "all persons, firms or corporations" in order to discern which entities were thereafter to be held harmless from further claims.

*Lennon,* particularly when read with the gloss which the First Circuit has placed upon it in *Day,* appears to foreshadow that Rhode Island is poised, in a reasoned choice among the competing alternatives, to cast its lot with the adherents of the intent rule. And, the adumbration of *Hashway* (a decision which did not cite to *Lennon* and which sheds no direct light thereon) portends the same. But, the signals are not so clear that the court need venture no further.

Where there is an absence of indisputably authoritative guidance from the state's highest court, the First Circuit has instructed the district courts to interpret the statute at issue "with the aid of opinions of courts in other states interpreting similar statutes." *Murphy v. Erwin-Wasey, Inc.,* 460 F.2d 661, 663 (1st Cir.1972). With this directive in mind, this court has examined the caselaw from the other jurisdictions which have applied either the UCJTA or some similar statute to a release purporting to discharge the whole world.

The dozen or so jurisdictions that have undertaken this task have embraced some one of the three rules outlined above in approximately even numbers. There is neither a clear majority view nor a detectable trend among the lattermost cases. Nationally, the judiciary has not given the appearance of reaching a consensus or of moving in a particular direction. In addition, the conclusions which can be drawn from any such study are clouded by the variables that have affected the outcomes of individ-

ual cases. These variables include the ambiguity of several of the holdings, the relationship of the "unless the release so provides" statute to other statutes,[5] and the different types of general releases at issue in each case.

Finally, a review of cases from jurisdictions that have not adopted statutes governing the effect of releases has yielded results that are even more equivocal. While a number of these cases can be read to support the intent rule, *see Gray v. General Motors Corp.*, 434 F.2d 110, 112 (8th Cir.1970) (applying Minnesota law); *Porter v. United Steel & Wire Co.*, 436 F.Supp. 1376, 1380 (N.D. Iowa 1977); *Taylor v. Beech Aircraft Corp.*, 407 F.Supp. 69, 71–74 (W.D.Okla.1976); *Leaf v. City of San Mateo*, 104 Cal.App.3d 398, 410–11, 163 Cal.Rptr. 711 (1980); *Fieser v. St. Francis Hospital & School of Nursing, Inc.*, 212 Kan. 35, 510 P.2d 145, 149–50 (1973); *Stitt v. Mahaney*, 403 Mich. 711, 272 N.W.2d 526, 527 (1978); *State ex rel. Normandy Orthopedics, Inc. v. Crandall*, 581 S.W.2d 829, 833–34 (Mo.1979); *Scheideler v. Elias*, 209 Neb. 601, 309 N.W.2d 67, 74–75 (1981); *Breen v. Peck*, 28 N.J. 351, 146 A.2d 665, 674 (1958); *Brackenbrough v. MacCloskey*, 42 Or.App. 231, 600 P.2d 481, 484 (1979), many of them apply only to successive (rather than simply joint) tortfeasors. *See, e.g., Taylor*, 407 F.Supp. at 72 (applying intent rule in products liability suit against airplane manufacturer); *Fieser*, 510 P.2d at 149–50 (applying intent rule in medical malpractice suit); *Stitt*, 272 N.W.2d at 527 (same); *Normandy Orthopedics*, 581

S.W.2d at 831 n. 1, 833–34 (same); *Scheideler*, 309 N.W.2d at 74–75 (same). Because the Uniform Act abolished the distinction between concurrent and consecutive tortfeasors, *see, e.g.*, R.I.Gen. Laws § 10–6–2; *see also McInnis I*, 765 F.2d at 250 ("The parties are jointly and severally liable if they are both the legal cause of harm that cannot be apportioned, whether [their] conduct is concurring or consecutive."); *Day*,[1] 702 F.2d at 12, the ramifications of these cases are limited. Thus, the sister state decisions, though providing some insightful analysis, do not inexorably steer this court to any firm or definite conclusion.

The other available guideposts, however, tend to point with greater certainty toward a resolution of the problem. Chief among these are dicta and other statements of the state supreme court indicative of the direction in which the judicial wind is blowing. Of equal importance are the policy considerations which inevitably underlie the choice among differing rules of law in the context of universal releases.

Despite the absence of a definitive holding in the state courts on the exact point at issue, there are telltale indicia within the penumbras of Rhode Island's jurisprudence. The state supreme court has declared that the relevant statute, R.I.Gen. Laws § 10–6–7, "was designed to reverse the well-established rule of law under which a release of one joint tortfeasor discharged all other joint tortfeasors." *Smith v. Raparot*, 101 R.I. 565, 225 A.2d

---

5. For example, several states have enacted a provision which would relieve the released joint tortfeasor from liability to make contribution to any other joint tortfeasor. *See Hurt*, 380 So.2d at 433 (applying Fla.Stat.Ann. § 768.31(5)(b) (West Supp. (1985)); *Alsup*, 77 Ill.Dec. at 741, 461 N.E.2d at 364 (applying Ill.Rev.Stat. ch. 70, § 302(d) (1979)); *Harris*, 599 P.2d at 584 (applying Wyo.Stat. § 1–1–113(a)(ii) (1977)). Such a provision, although part of the UCJTA, *see* Uniform Contribution Among Joint Tortfeasors Act § 4, 12 U.L.A. 98 (1975), was not adopted verbatim by Rhode Island, *see* R.I.Gen. Laws § 10–6–8, and appears to have been rejected by most states. At least one court has viewed the presence or absence of this provision as critical

to the outcome of the question at issue in this case (a proposition of some dubiety). *See Douglas*, 670 F.2d at 794 n. 4 (comparing absence of such provision in Arkansas to presence of such provision in Florida). In those states which have adopted such a provision, the courts have not reached uniform results. Although none of them have barred the plaintiff's suit, the Florida Supreme Court adopted an intent rule, *see Hurt*, 380 So.2d at 433–34, the Illinois Supreme Court adopted a specific identity rule, *see Alsup*, 77 Ill.Dec. at 740–41, 461 N.E.2d at 363–64, and the Wyoming Supreme Court adopted an intent rule where a release discharged "any claims," *see Harris*, 599 P.2d at 585–86.

666, 667 (1967) (citation omitted). The flat bar rule advocated by the defendants, which would permit tortfeasors in *pari delicto* to benefit automatically from releases procured by any one of them, in which they did not participate and for which they gave no meaningful consideration, would needlessly frustrate the state legislature's effort to establish new (and fairer) rules of joint tortfeasor liability. Moreover, the state supreme court held some years ago that a stranger to a contract could not prevent the admission of parol evidence to aid in interpretation of that contract. *Inman v. Marcus*, 71 R.I. 232, 43 A.2d 320, 322 (1945). Such an interdiction is, of course, precisely what H–D, a stranger to the McInnis/Poirier release, seeks to accomplish here. The *Inman* rule cannot be reconciled facilely with H–D's constricted reading of *Lennon*. *Inman* reflects, accurately, that the Rhode Island courts have adopted a consistently unsympathetic position toward parties who seek to take gratuitous advantage of agreements in which they took no part.

Statements made by the Rhode Island Supreme Court in the course of its continuing effort to strip away artificial and/or anachronistic barriers to tort recovery are also telling. That tribunal has made no secret of its belief that "the law is always concerned that an injured party shall be fully compensated for whatever injury he may have sustained." *DeSpirito v. Bristol County Water Co.*, 102 R.I. 50, 227 A.2d 782, 784 (1967). In order to balance the harm/remedy scales more evenly, the state judiciary has abolished the venerable privity requirement, because "whether the defendant should be strictly liable for injuries caused by a defective product is a question which cannot be determined by resort to doctrines of contract law, such as privity of contract, which developed in response to considerations for the most part not here relevant." *Ritter v. Narragansett Electric Co.*, 109 R.I. 176, 283 A.2d 255, 261 (1971). Similarly, the court has held commercial lessors of dangerously defective goods strictly liable. *Brimbau v. Ausdale*

*Equipment Rental Corp.*, 440 A.2d 1292, 1298 (R.I.1982). The court found that

> [Lessors] stand in a far better financial and technical position than lessees to insure against, prevent, and spread the costs of product-related injuries.... [L]essees of goods might have a lesser opportunity to inspect a leased item than would a purchaser, and would rely to a greater extent upon an implied assurance by the lessor that the product is safe for its intended purpose.

*Id.*

In recent decades, the state supreme court has removed a number of the barriers which statutes of limitations previously posed to plaintiffs' causes of action. In holding that in medical malpractice suits the statute of limitations does not commence until the plaintiff discovers the injury which resulted from the physician's negligence, the court emphasized that "only the negligent physician is protected by the strict interpretation of the statute of limitations in malpractice cases at the cruel expense of the public and of the competent physician." *Wilkinson v. Harrington*, 104 R.I. 224, 243 A.2d 745, 753 (1968). Later, the court applied the same discovery rule to products liability actions, noting that

> The purpose of the law of products liability is to take the burden of the injury from the consumer, who cannot protect himself and who may face economic ruin, and transfer it to the supplier.

*Romano v. Westinghouse Electric Co.*, 114 R.I. 451, 336 A.2d 555, 561 (1975) (citation omitted). In response to the defendant's assertion that such a liberal rule would multiply the number of claims, the court observed that the bogeyman of a possible "proliferation of claims is not a reason to withold relief, but to grant it." *Id.*, 336 A.2d at 560. And, in striking down the absolute bar to products liability suits ordained by the Rhode Island General Assembly (ten years from date of sale), the court emphasized its preference that a "plaintiff should have his day in court to show whether he is entitled to relief." *Kennedy*

*v. Cumberland Engineering Co.*, 471 A.2d 195, 201 (R.I.1984).

Recently, the court adopted an expansive reading of the discovery rule to enhance the rights and remedies of victims of tortious conduct:

[W]here the manifestation of an injury, the cause of an injury, and the person's knowledge of the wrongdoing by the manufacturer occur at different points in time, the running at the statute of limitations would begin when the person discovers, or with reasonable diligence should have discovered, the wrongful conduct of the manufacturer.

*Anthony v. Abbott Laboratories*, 490 A.2d 43, 46 (R.I.1985). The court rejected defendants' argument that such a generous interpretation would result in the "unexpected enforcement of stale claims." *Id.* at 46. Rather, the court found that "because this product [diethylstilbestrol] usually affects a different generation from that which received the product, plaintiffs and not defendants would be most prejudiced by faded memories, misplaced records, or deceased witnesses." *Id.*

To enable tort victims to recover, the Rhode Island courts have also recently undercut the common law doctrine of intrafamily immunity in tort actions arising from motor vehicle collisions. *See Silva v. Silva*, 446 A.2d 1013, 1015–16 (R.I.1982) (abrogating parent-child immunity); *Digby v. Digby*, 120 R.I. 299, 388 A.2d 1, 3–4 (1978) (abrogating interspousal immunity). Rejecting the contention that "the existence of liability insurance may increase the temptation to engage in fraud or collusion," *id.*, 388 A.2d at 3, the court deferred to "the general principle of tort law that where a wrong has been committed, there should be recovery, absent strong countervailing public policy reasons." *Id.*, 388 A.2d at 4. *See also Silva*, 446 A.2d at 1015–16.

In fine, recent decisions of the state supreme court reflect the running of a tide which flows in the direction of insuring that an injured party has the fairest, most realistic opportunity to recover just damages from any and all persons responsible for the harm. And, the flat bar rule espoused by H–D in this case is at cross-currents with this philosophy. Given a choice between strict and expansive views of the rights of an injured party, the state supreme court has manifested time and again a propensity to drop anchor on the liberal side of the channel.

The policy considerations which counsel in favor of rejecting the flat bar principle have great persuasive force in such a relatively latitudinarian environment. To be sure, the flat bar rule is easy to administer—but it has little else to commend it as a matter of basic fairness. It is but a pale pastiche of the old, discredited dogma—spurned by the Rhode Island General Assembly in its enactment of the UCJTA—that a release of one tortfeasor absolved all. A wide range of courts and commentators have provided ample reasons for eschewing such a per se rule. Dean Prosser has emphasized that

The only desirable rule would seem to be that a plaintiff should never be deprived of a cause of action against any wrongdoer when the plaintiff has neither intentionally surrendered the cause of action nor received substantially full compensation.... Where there has been such full satisfaction, or where it is agreed that the amount paid under the release is so received, no claim should remain as to any other tortfeasor; but these are questions of fact, and normally to be determined by the jury, where the amount of the claim is unliquidated.

*Prosser*, § 49 at 335 (footnotes omitted).

Similar guidance can be derived from the teachings of the United States Supreme Court. In a variety of arenas, the Court has signaled its disdain, as a matter of policy as well as of federal law, for jerry-built rules which give broad preclusive effect to release agreements. Thus, in the antitrust area, the Court has adopted "[t]he straightforward rule ... that a party releases only those other parties whom he intends to release." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321,

347, 91 S.Ct. 795, 810, 28 L.Ed.2d 77 (1971). So, too, in an intellectual property setting. *See Aro Manufacturing Co. v. Convertible Top Co.*, 377 U.S. 476, 501, 84 S.Ct. 1526, 1539, 12 L.Ed.2d 457 (1964) (adopting intent rule for patent infringement cases). The Court rejected the older rules which automatically released the joint tortfeasors, *see Zenith*, 401 U.S. at 343, 91 S.Ct. at 808, or required an express reservation of rights against them, *see id.* at 344, 91 S.Ct. at 809, because these rules "would frustrate ... partial settlements, and thereby promote litigation, ... [and] would create a trap for unwary plaintiffs' attorneys." *Id.* at 347, 91 S.Ct. at 810.

Several courts have spoken to the inadvisability of employing the flat bar rule in the UCJTA context, and have offered a plethora of compelling reasons for refusing to sanction such a harsh protocol. The Florida Supreme Court[6] has furnished a particularly exhaustive explanation of the rationale for imposing the intent rule in preference to the flat bar:

> Discharge of all potential defendants may have far-reaching consequences for an injured plaintiff. As such, it is important that the releasor's intent to give a general release be clearly expressed....
>
> This release is a printed form with blanks left for the names of those specifically discharged. The printed general release clause immediately follows those blanks. [The plaintiff] argues that the use of such general release clauses originated to protect those persons in privity with the named parties.... Under this theory, the all-inclusive language was routinely included in printed releases as "boilerplate," and may not reflect the intent of the parties.
>
> We agree with [the plaintiff]. The common law rule was abolished in part to avoid imposing the harsh consequences of a general release upon often unsuspecting plaintiffs.... We feel that the manifestation of intent must be more

explicit than signing a printed form which happens to contain broad, general release language in addition to providing spaces for the specifically discharged parties.

> The presence of the two types of release, one printed and one written, within a single form creates at least a latent ambiguity. Generally, ambiguities are construed against the drafter of the instrument. Another basic rule is that where written and printed provisions conflict, the written terms ordinarily prevail. However, we feel that the better rule in these particular circumstances is to allow extrinsic evidence of the parties' intent.

*Hurt*, 380 So.2d at 433–34 (citations omitted). *See also Sellon*, 521 F.Supp. at 983–84 (holding that a general release of the type here at issue created an ambiguity which "necessitate[s] admission of extrinsic evidence on the issue of the release's intended scope"); *Manos*, 295 F.Supp. at 1169–70 ("Even though there was general language in the release, the size of the settlement and that fact that [the defendant] was not named specifically cast more than a shadow of doubt on the intentions of the signing parties to compromise a potentially very large recovery against [the defendant].... Reading the document in its entirety, this court is convinced that ... at least a question of fact is raised as to the intended effect of the releases.").

*Hurt* has the ring of realism and of common sense. The rationale espoused therein is appealing as a matter of simple justice and is consonant with the approach consistently taken to analogous problems by the state supreme court over the last two decades. The tenor of Rhode Island jurisprudence is to withhold from a wrongdoer a trouvaille for which it has not bargained and to be slow to strip away a victim's right to recover for actionable negligence. To preclude redress on the basis of a legal fiction arising from the chance

---

**6.** This court is mindful of the effort which has been made to distinguish the Florida cases. *See Douglas*, 670 F.2d at 794 n. 4; *see also* n. 5, *ante.* Whatever the idiosyncracies of Florida's statutory scheme, the policy pronouncements of the *Hurt* court seem entirely valid and pertinent in the Rhode Island context.

insertion of boilerplate wording in a printed form of release procured by one other than the defendant is at odds both with fundamental fairness and with the threads which bind together the fabric of Rhode Island's judge-made tort law. This court concludes that, when squarely confronted with the issue, the Rhode Island Supreme Court would exhibit scant hesitation in rejecting the flat bar monition vis-a-vis releases of the world at large.

This is not to say, reflexively, that the intent rule prevails. As noted earlier, McInnis argues for a specific identity rule, pursuant to which, because H–D is neither named nor otherwise specifically identified in the release, the document would be insufficient as a matter of law to assist the defendant in the face of the plaintiff's present claim. The reasoning of those courts that have implemented such a tenet is not unpersuasive. *See Alsup*, 77 Ill.Dec. at 740–41, 461 N.E.2d at 363–64; *Sage*, 347 N.Y.S.2d at 418–19; *Beck*, 439 N.E.2d at 420. *See also Young v. State of Alaska*, 455 P.2d 889, 893 (Alaska 1969) (adopting specific identity rule prior to adoption of the UCJTA); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419–20 (Tex.1984) (adopting specific identity rule in absence of statute); *McMillen v. Klingensmith*, 467 S.W.2d 193, 196 (Tex.1971) (adopting specific identity rule in absence of statute where release exonerates releasee from "any and all actions" but does not discharge "all persons, firms and corporations"). In particular, the Illinois and Ohio Supreme Courts have emphasized that a narrow construction of the statutory language effectuates the Uniform Act's goal of abrogating the common law rule and protecting the plaintiff. *See Alsup*, 77 Ill. Dec. at 740–41, 461 N.E.2d at 363–64 ("A purpose of the uniform act was to abrogate the common law rule.... If liberal effect were given to every use of a general release form and 'all other persons, firms and corporations' ... were to be discharged, an important purpose of the Act would be thwarted by the unin release of persons who were strangers to the release contract."); *Beck*, 439 N.E.2d at 420 ("The

thrust of the section is to retain the liability of tortfeasors.... Allowing a discharge based upon general language which does not name or identify a tortfeasor perpetuates the common law rule and is contrary to the statute.").

While the specific identity rule virtually eliminates all danger that an unwary victim may unintentionally discharge his rights, it seems to swing the pendulum too far in the other direction. There is nothing in the UJCTA which suggests that a releasor must be punctilious in identifying every person whom he intends to acquit in a highly stylized manner or that a releasee who desires to secure a discharge of other tortfeasors can do so only with near-mathematical precision. This court is loath to read into statutes any requirement necessitating "formulary incantations" to which "talismanic effect" automatically attaches. *Bank of New York v. Hoyt*, 617 F.Supp. 1304, 1309 (D.R.I.1985). Logically, it is the intentions of the actors, rather than the presence or absence of buzzwords, which should govern. "There is no rhyme or reason in requiring a party to dance a ritualistic jig purely for its own sake." *Lopez v. Bulova Watch Co.*, 582 F.Supp. 755, 764 (D.R.I.1984). Just as the legitimate rights of an injured person merit protection, so, too, a putative defendant has rights which would unfairly be chilled by the infrigidation of the specific identity doctrine.

Moreover, the Rhode Island Supreme Court has not given any indication that it would implement such a stringent rule. The court's opinion in *Lennon* strongly suggests that Rhode Island is not inclined to announce that unnamed joint tortfeasors can never be discharged by using an "all other persons, firms or corporations" clause. In holding that a release which contained such a provision was ambiguous, the *Lennon* court remarked that "one interpretation is that the parties to the release intended to release all persons from liability to [the plaintiff]." *Lennon*, 423 A.2d at 822. Implicit in this pronouncement is the recognition that *another* interpretation exists—an interpretation under

which it might be found that the releasor and releasee indeed sought to give literal effect to the omnibus language of the writing. The choice between these interpretations is, of course, dependent upon the intentions of the parties in a given instance.

■■■ This court is constrained to follow the state supreme court's lead. "It is not for this court, sitting in diversity jurisdiction, to blaze a new trail where the footprints of the state courts point conspicuously in a contrary direction." *Plummer*, 568 F.Supp. at 927. That principle is apposite here. The Rhode Island cases indicate a preference for the intent rule. And, such a choice strikes this court as the best and fairest available alternative.[7] Thus, this court couples its repudiation of the flat bar doctrine with an equally firm repudiation of the specific identity rule.

■■ Accordingly, the principal asseverations of both McInnis and H–D must be rejected. Though the cloud cover is dense, the legal landscape is spangled with light and dappled shade, and the fulgurations which streak through the skies of Rhode Island jurisprudence illuminate the way. The reported decisions of both the Rhode Island Supreme Court and the First Circuit plainly foreshadow that Rhode Island, when the time comes, will eschew the two extremes, and will coronate neither the flat bar rule nor its opposite number, the specific identity rule. These presentiments, bulwarked by the compelling force of policy considerations and by the unremitting search for the better rule of law, lead inexorably to the conclusion that the Rhode Island courts would most comfortably embrace a paradigm which would give effect to an omnibus release of the sort here at issue according to the intentions of the parties between whom the discharge was negotiated and delivered.[8]

In passing upon the pending motions for *brevis* disposition, the court has "at-

---

7. Where a federal court must vaticinate how state courts would decide an unsettled issue of state law, "a federal court may reasonably assume that [the state courts] will follow the rule that appears best to effectuate the policies that underlie the rule." *Bowen v. United States*, 570 F.2d 1311, 1322 (7th Cir.1978). To be sure, the federal courts, sitting in diversity jurisdiction, have no roving commission to superimpose federal choices upon the framework of state law; the task at hand is to "determine the rule that the [state] Supreme Court would probably follow, not fashion a rule which ... an independent federal court, might consider best." *Lowe's North Wilkesboro Hardware, Inc. v. Fidelity Mutual Life Insurance Co.*, 319 F.2d 469, 472 (4th Cir.1963). Yet, in the absence of some authoritative expression by the state courts, a qualitative evaluation of the "better" principle of law can come into play. A federal court's "conceptions of sound and just rules", *Winston Corporation v. Continental Casualty Company*, 508 F.2d 1298, 1304 (6th Cir.1975), are entitled to some weight, if only because of the presumption that the state courts, when confronted by exactly the same question, would be similarly persuaded by the same considerations of suitability. So, if other guidance is lacking, "the [federal] court may assume that the state courts would adopt the rule which, in its view, is supported by the thrust of logic and authority." *Stool v. J.C. Penney Company*, 404 F.2d 562, 563 (5th Cir.1968) (footnote omitted).

Happily, in this case all roads lead to Rome. Though there is no controlling decision of the Rhode Island Supreme Court, analogous cases and the expressed policy inclinations of that tribunal coalesce precisely with this court's assessment of the fairest and best view of the release question.

8. Even if the Rhode Island Supreme Court would not apply an intent rule in every circumstance where the instrument released "all persons, firms or corporations," it would do so in this instance because of the ambiguity created by other clauses in the document itself. The *Lennon* court has clearly directed an examination of the intent of the parties where various provisions in a single integrated instrument "are in apparent conflict and give rise to different interpretations." *Lennon*, 423 A.2d at 822. As one district court has noted in interpreting a similar release, "[t]o comprehend a contract, all of its terms must be addressed. No single phrase, in isolation, controls the agreement." *Sellon*, 521 F.Supp. at 983.

In addition to the clause purporting to discharge "all persons, firms or corporations" from all claims, the McInnis/Poirier instrument contains the language that "any party hereby released admits no liability" to McInnis. *See* Appendix A. The *Sellon* court, in construing a release very similar to this one, concluded that the denial of liability on behalf of the world at large created an ambiguity necessitating the admission of extrinsic evidence:

If the "parties hereby released" refer strictly to the [releasees] and those ... in privity with them and involved in the negotiations, then it makes sense that the document speak for

tempt[ed] to forecast the interpretation that the state court would, if confronted by the issue, place on the statute" at issue in this case, to wit, R.I.Gen. Laws § 10–6–7. *Fischer v. McGowan,* 585 F.Supp. 978, 985 (D.R.I.1984). This court concludes that, if faced with this stock release containing boilerplate verbiage purporting to acquit "all persons, firms or corporations," the Rhode Island courts would examine the intentions of the parties to the release with the aid of extrinsic evidence. The instrument itself is not, in these circumstances, dispositive of the issues raised in this proceeding.

## VI. APPLICATION OF THE INTENT RULE

When Pythagoras proved his theorem, he is reputed to have breathed a noticeable sigh of relief and given one hundred oxen to the Muse. No such surcease awaits this court. The rule embraced must yet be applied to the pending motions.

H–D's initiative need not long detain the court. It is grounded strictly and solely within the four corners of the instrument. Thus, this court's holding that the release alone, without a corollary assessment of the intentions of the releasor and of the releasee in the premises, is insufficient to preclude McInnis's suit against the manu-

facturer as a matter of law, a fortiori determines the fate of the motion. H–D has proffered no meaningful evidence to demonstrate that either Poirier or McInnis bargained for (or, for that matter, received) a discharge of H–D's liability. The defendants' Rule 56 motion cannot be granted.

The court must next address the plaintiff's motion for partial summary judgment. To the extent that she asseverates, as a matter of law, that the release in and of itself is inadequate to discharge these defendants, her motion must fail. The court's rejection of the specific identity rule prohibits McInnis's effort to assign dispositive effect to the absence of language within the contours of the release itself from which the identity of H–D could be definitively gleaned.

The plaintiff, however, has yet another string to her bow. She has adduced some evidence, in the form of affidavits and correspondence, which tends to show that the negotiations with Poirier's insurer never focused on the question of H–D's liability *vel non,* and that the parties to the release never intended that the execution of the instrument would relieve these defendants from their alleged responsibility for the loss of McInnis's leg. But, the nisi prius roll is less than explicit in those respects.[9]

---

them. . . . On the other hand, if "parties hereby released" has the universal scope claimed by [the defendant], then, in denying liability and expressing intent to buy peace, the document, rather grandiloquently, purports to speak for the world.

*Id.* at 984.

The release at issue here is also amphibolous for other reasons. The instrument states that "Patricia McInnis, for the sole consideration of $60,000 . . . paid by Florence Poirier [has] released and discharged . . . Florence Poirier and all other persons, firms or corporations. . . ." The fact that the release was executed in exchange for funds tendered solely by Poirier suggests that McInnis did not intend to release unnamed joint tortfeasors who did not contribute to the consideration for the release. The skimpiness of the settlement amount, measured against the severity of the plaintiff's injuries, itself creates some uncertainty. *Manos,* 295 F.Supp. at 1169–70. And, an argument can be made, for what it may be worth, that only those claims which resulted from the traffic accident itself, and not from a defect in the product,

were intended to be discharged by Poirier's release.

In sum, this court finds that the release in this case is sufficiently akin to the *Lennon* release so as to warrant the introduction of parol evidence of what the parties sought to accomplish even apart from an outright adoption of the intent rule.

9. H–D suggests, for example, that Edward Parant, the adjuster for Poirier's insurance carrier, testified that he intended to protect Poirier from third-party actions for contribution when he filled out the release. Defendants' Brief at 7. But, no transcript of any such testimony has been proffered. It is not the court's obligation to rummage through a massive record in search of a factual needle in the haystack of the nisi prius roll sufficient to deflect or to further a Rule 56 initiative. *See Stepanischen v. Merchants Despatch Transportation Corp.,* 722 F.2d 922, 930 (1st Cir.1983). "The burden is on both parties to file necessary materials with the court to support their claims for and against summary judgment." *General Office Products Corp. v.*

Certainly, the record must be viewed in the light most favorable to the nonmovant, and all plausible inferences must be drawn in the manner least hospitable to the granting of the motion. *See generally* text *ante* at Part IV and cases cited. The court, in addressing summary judgment motions, has a certain "negative discretion" which it may exercise in the interests of fundamental fairness. *McLain v. Meier*, 612 F.2d 349, 356 (8th Cir.1979); *National Screen Service Corp. v. Poster Exchange, Inc.*, 305 F.2d 647, 651 (5th Cir.1962); *cf. Quinones v. Nettleship*, 773 F.2d 10, 15 (1st Cir.1985) (per curiam) (summary judgment inappropriate where the parties "have raised sufficient unanswered questions to require [the] case to go forward with more complete development of the facts"). And, parties should be allowed adequate time to put their best foot forward so that the summary judgment trigger is not precipitately pulled. *Cf.* Fed.R.Civ.P. 56(f).

Courts cannot permit themselves to languish in ivory towers far removed from the real world. "The principles governing summary judgment procedure should be applied in a common sense manner to the realities of the litigation at hand." *Williams v. Howard Johnson's Inc. of Washington*, 323 F.2d 102, 105 (4th Cir.1963). These prudential precepts, it would seem, have especial force when issues of intent and state of mind are on the table. Though the mere presence of such issues does not debar the grant of *brevis* relief in appropriate circumstances, *e.g., Gallagher v. Taylor*, 737 F.2d 134, 137 (1st Cir.1984), they must be handled with particular care in the Rule 56 environment. The First Circuit has phrased it well:

> In cases where … the state of mind of one of the parties is crucial to the outcome of the case, resort to summary judgment is vested with more than the usual difficulty. Under such circumstances, jury judgments about credibility are typically thought to be of special importance. Thus courts are particularly

*A.M. Capen's Sons, Inc.,* 780 F.2d 1077, 1078 (1st

cautious about granting summary judgment in such cases.

*Stepanischen,* 722 F.2d at 928.

■ The parties have waited long and patiently, through some three and one-half years of ongoing litigation, for a meaningful assessment of the legal effect of the McInnis/Poirier release vis-a-vis H–D. It strikes this court as singularly inappropriate to drop the bombshell in this rescript and then, on a scumbled record, to dispose hastily of the imbricated question of the parties' intent as well. It would be far fairer, now that the legal terrain has been illuminated, to give the plaintiff and the defendants alike an opportunity to draw a bead on the target in light of the holding that the intent rule will govern. Such considerations counsel, accordingly, in favor of the court's exercise of its negative discretion, resulting in the denial of McInnis's Rule 56 motion without prejudice to its renewal at the plaintiff's option.

## VII. CONCLUSION

Under Rhode Island law, the release which McInnis signed at Poirier's instance discharging Poirier and "all other persons, firms or corporations" does not, as a matter of law, save H–D harmless from any and all liability to the plaintiff accruing by reason of its manufacture and design of an allegedly defective and unsafe clutch housing. This court predicts that the Rhode Island courts would embrace and apply the intent rule in such a situation, and that preclusion of McInnis's claim against H–D did not automatically arise coincident with her execution of the release at issue.

For these reasons, the defendants' motion for summary judgment is DENIED.

The plaintiff's motion for partial summary judgment must likewise be DENIED, for much the same reasons, insofar as it relies upon the specific identity rule. The Rhode Island courts would not require that the identity of a released tortfeasor be specifically cognizable, by name or in an equivalently definite manner, from the face

Cir.1986).

of the release itself in order to confer exoneration.

Finally, the plaintiff's motion for partial summary judgment, to the extent that it rests upon an application of the intent rule to the circumstances of this case, is DENIED without prejudice to its renewal on a properly-focused record.

*It is so ordered.*

## APPENDIX A

## RELEASE IN FULL

**Know all Men by these Presents,** That I, ......*Patricia Mc Innis*..........

for the sole consideration of ..........*"60,000"*.......... Dollars,

to me ....... in hand paid by ......*Florence Parier*...... have released and

discharged, and by these presents do for myself ..........., my .......... heirs, executors, administrators and

assigns, release and forever discharge the said ......*Florence Parier*......

and all other persons, firms or corporations from all claims, demands, damages, actions, or causes of action, on account of damage to property, bodily injuries or death, resulting, or to result, from an accident to *Patricia Mc Innis* .......... which occurred on or about the .......*16th*.......

day of ....*Aug*...., 19*81*, by reason of ......*auto motorcycle accident on the 2x main st no Smithfield RI*......

and of and for all claims or demands whatsoever in law or in equity, which I .........., my .......... heirs, executors, administrators, or assigns can, shall or may have by reason of any matter, cause or thing whatsoever prior to the date hereof.

**It is Understood and Agreed that** this is a full and final release of all claims of every nature and kind whatsoever, and releases claims that are known and unknown, suspected and unsuspected.

✓ **It is Further Understood and Agreed that** any party hereby released admits no liability to the undersigned or any others, shall not be estopped or otherwise barred from asserting, and expressly reserves the right to assert any claim or cause of action such party may have against the undersigned or any others.

**In Witness Whereof,** I .......... have hereunto set my .......... hand.... and seal.... this ......*6th*......

day of ....*November*...., 19*81*.

IN THE PRESENCE OF

*John E. Harwood esq.*          ..............*Patricia A. McInnis*.............. (Seal)

.......................................          ....................................................................... Street

.......................................          ....................................................................... Town—State

.......................................          ....................................................................... (Seal)

............ Street

............ Town—State 15

.(C-1744)