USCA1 Opinion

 

 July 6, 1992 ____________________ No. 91-2325 GLENDA CAROLE DESENNE, Plaintiff, Appellant, v. JAMESTOWN BOAT YARD, INC., Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Raymond J. Pettine, Senior U.S. District Judge] __________________________ ____________________ Before Aldrich and Coffin, Senior Circuit Judges, _____________________ and Young,* District Judge. ______________ ____________________ Susan M. Carlin for appellant. _______________ Amy Beretta with whom A. Lauriston Parks, Hanson, Curran, Parks & ___________ ___________________ _______________________ Whitman, and Standard, Weisberg, Heckerling & Rosow, PC, were on brief _______ __________________________________________ for appellee. ____________________ ____________________ ____________________ *Of the District Of Massachusetts, sitting by designation. COFFIN, Senior Circuit Judge. Plaintiff DeSenne suffered _____________________ serious injury when the boat on which she served as a crew member sank at sea. She filed this diversity action against Jamestown Boat Yard, Inc. (Jamestown) alleging that its negligence in making repairs caused her injuries. Prior to this lawsuit, plaintiff settled her claims with the vessel's owners and insurer and gave a release of all her rights. The appeal raises two questions: was the release champertous and void under Rhode Island law? and, if not, should the release nevertheless be reformed so as to convey plaintiff's rights only to the extent necessary to reimburse the boat's owners and insurers for monies paid to her? The district court answered "No" to both, and so, after reflection, do we. The Facts On November 7, 1987, the sailing vessel "Isle" sank in a fierce storm in the Atlantic en route from Point Judith, Rhode Island to the Azores. Plaintiff, on board as both passenger and crew, suffered abrasions, a concussion, injuries to her teeth, jaw, and toe, enduring pain, and the loss of wages and property including navigation equipment. An insurance adjuster, one Amato, represented the Isle's owners, the Beisers, and their insurers. He maintained contact with plaintiff for nearly a year and a half, took care of her medical bills, paid for her loss of personal property, agreed to pay for dental work and for treatment at a pain management clinic, and finally, on August 16, 1989, obtained a release from her. -2- When plaintiff executed the release, Amato presented her with a check for $20,000. In addition, further medical bills (for dental work and pain management) were guaranteed up to a cap of $7,500. Six thousand dollars had been paid for property loss. The release, an eclectic borrowing from other forms devised by Amato for his standard use, ran to the owners and underwriters, and to the Isle itself. It would be difficult to contemplate a document with a broader reach. It began by reciting that in consideration of the sum of $20,000 the releasees were discharged of all actions, including those under four specific statutes, but extending to causes of action under all pertinent laws, state and federal. It encompassed all remedies attributable to some 46 specified mental and physical injuries and ailments. It stated that "all of my possible rights" under all "possible laws" had been explained to plaintiff, and that she fully understood that her disabilities might increase or that they might have been misdiagnosed. It concluded by stating that, in addition to "giving up every right" to releasees, plaintiff assigned "all rights . . . to any and all . . . causes of action [present or future]," empowered releasees "to make claim, file suit and to take all other legal action necessary with the same force and effect as [plaintiff]," and assigned "the express right . . . to reassign, release or dismiss with prejudice any . . . causes of action" connected with the accident. One week after plaintiff executed this release, Amato wrote his superiors, noting that plaintiff might be the Beisers' and -3- their insurers' "best witness in the recovery against Jamestown Boatyard," and explaining, "in approaching settlement, I did not want to cause any negative feelings which might alter future cooperation." He then referred to plaintiff's suffering "pain that will be a permanent part of her life," and his side agreement to pay an additional amount of $7,500 for subsequent medical expenses "[t]o make her comfortable with a settlement." He also noted a significant wage loss as a factor in the $20,000 settlement amount. He concluded, "I had her execute a Release which covers Jones Act status and assigns all rights of recovery to underwriters. As I understand from the facts uncovered to date, our chances for recovery are excellent." In his deposition testimony, Amato stated that he felt that the release was solely to protect the Beisers and their insurers against suit by plaintiff. The money paid plaintiff was for lost wages, loss of personal property, pain and medical expenses. Although he did not say so to plaintiff, he felt that she had not waived any claims against Jamestown. He could not say that she had read the release but described her as someone who "would not sign a five-page document without reading it." Plaintiff, in her testimony before the court, said that, although Amato had suggested that she read the release and then "walked away," she did not read it, being "a very trusting person." She asked Amato if signing the document would prevent her from suing Jamestown at some future date. Amato said, "No." As of the date of the release, she was "contemplating looking into" filing a claim -4- against Jamestown, but felt that she would not need a lawyer because it would be a "joint suit" managed by the Beisers' insurance company. Nine months earlier, on November 17, 1988, the Beisers had filed suit against Jamestown for the loss of the Isle and personal injuries suffered during the sinking and rescue. Jamestown cross-claimed for money allegedly owed for repair work. Nine months after the release was executed, on May 17, 1990, trial began and plaintiff in the instant case, DeSenne, testified. On May 23, 1990, the action was settled and dismissed with prejudice. Under the settlement agreement, Jamestown agreed to pay the Beisers $300,000 and the Beisers were to pay Jamestown $10,472.32, each party giving the other releases of all claims. Legality of the Assignment Jamestown moved to dismiss the instant action by reason of plaintiff's assignment to the Beisers and the latters' release of all claims as part of the settlement of May 23, 1990. Plaintiff opposed dismissal on the ground that the release she gave the Beisers was contrary to Rhode Island public policy forbidding assignment of personal injury causes of action as champertous. The district court, after reviewing the pertinent Rhode Island cases, ruled: The assignments were made in furtherance of settlement and were not "the purchasing of personal-injury claims by intermeddling volunteers for their own profit." As there is no danger of champerty or maintenance, I see no reason to allow Ms. DeSenne to evade the clear agreement she entered into and thus upset the settlement the parties have agreed upon. -5- Memorandum and Order, April 24, 1991, at 6 (citation omitted). We are in full agreement. The doctrine relied on by plaintiff stems from general language in Tyler v. Superior Court, _____ ______________ 30 R.I. 107, 73 A. 467 (1909) addressing the evils of maintenance.1 The court feared "the power of litigious persons, whether rich or poor, to harass and annoy others, if they were allowed to purchase claims for pain and suffering, and prosecute them in courts as assignees." 30 R.I. at 109, 73 A. at 468. It also observed that "there are no counterbalancing reasons in favor of such purchases, growing out of the convenience of business. . . ." Id. In the case before us, not only is the __ apprehended evil absent, but the practical requirements of facilitating settlements in multi-party litigation provide a weighty counterbalance. As Justice Kelleher remarked in Hospital Service Corp. of __________________________ R.I. v. Pennsylvania Ins. Co., 101 R.I. 708, 227 A.2d 105, 110 ____ _____________________ (1967), "We have come a long way since the ruling in Tyler . . . _____ ." Like the district court, we find a recent dispositive case, Etheridge v. Atlantic Mutual Ins. Co., 480 A.2d 1341 (R.I. 1984). _________ ________________________ In that case plaintiff had been injured in a motorboating accident. The tortfeasors were insured by two companies. One, Atlantic, was a primary insurer, with a policy limit of $50,000. ____________________ 1 The district court, quoting Black's Law Dictionary (4th ed. _______________________ 1968), defined maintenance as "maintaining, supporting, or promoting the litigation of another" and champerty as a "bargain by a stranger with a party to a suit, by which such third person undertakes to carry on the litigation at his own cost and risk, in consideration of receiving, if successful, a part of the proceeds or subject sought to be recovered." -6- Aetna, an umbrella carrier, covered losses in excess of $300,000, and was made a third party defendant by Atlantic. Aetna settled with the plaintiff, engaging in a structured settlement, agreeing to pay plaintiff $10,000 a year for life, with some medical and educational benefits. Plaintiff agreed to pay Aetna $50,000 plus half of any additional judgment obtained from Atlantic or any other party. The tortfeasors assigned to Aetna any proceeds recovered from Atlantic or another party. As appellee points out, it is clear that Aetna theoretically could have recovered more than it paid out to plaintiff. Plaintiff's recovery from Atlantic and third parties may have been enough so that its required payment to Aetna might have exceeded Aetna's payments, particularly if plaintiff did not long survive; and the tortfeasors' claims, assigned to Aetna, also may have produced a return for Aetna greater than its payments. Notwithstanding these possibilities, the Rhode Island court ruled that there was "no element of wagering or gambling involved in this agreement." 480 A.2d at 1346. It referred to the frequent situation where an insured person finds himself "the helpless victim of a technical dispute between insurers . . . ." Id. at __ 1345. The court reasoned: Under such circumstances, a company that pays the loss and absolves the insured from liability, except for the right to proceed against the other carrier, has performed a function that furthers rather than impedes public policy. Such agreements ought not to be rendered void or impeded by the simplistic maxim that the common-law assignments of personal injury claims were unenforceable. Id. __ -7- The Beisers' insurers were in precisely the position of Aetna in Etheridge and the agreement at issue here furthered the _________ same public policy. The insurers did not meet the definition of those the Etheridge court declared to be prohibited from _________ purchasing personal injury claims, i.e., "intermeddling volunteers for their own profit," id. __ The court in Etheridge deemed it absurd to apply the rule _________ against assignment of personal injury claims in a "context in which it has no meaning," id., and thereby "obstruct an __ appropriate device" for facilitating payment of a claim while preserving a right to pursue contribution. Id. That is, again, __ precisely the situation in this case. The Beisers and their insurers knew that, in settling with plaintiff, so long as Jamestown was not involved, there remained the possibility that in a future suit by plaintiff against Jamestown, they faced the possibility of a Jamestown claim for contribution. That this is not idle speculation is revealed in the following commentary of Professors Prosser and Keeton: The effect of a settlement with the plaintiff by the contribution defendant, who has received a release or a covenant not to sue, has perhaps given more difficulty than any other problem. The usual holding has been that the defendant so relieved of liability is not released from contribution. There has been much dissatisfaction with this because it becomes impossible for a defendant to settle the case, take a release, and close the file, since the potentialliability for contribution is still open. W. Keeton, Prosser and Keeton on Torts 50, at 340 (5th ed. ____________________________ 1984) (footnote omitted). -8- It is true that Rhode Island has a statute which relieves one settling tortfeasor from liability for contribution to another tortfeasor if a release is given by the injured party before such other tortfeasor has obtained the right to contribution and if the release "provides for a reduction, to the ___ extent of the pro rata share of the released tortfeasor, of the injured person's damages recoverable against all the other tortfeasors." R.I. Gen. Laws 10-6-8. But this device clearly was less attractive to the Beisers and their insurers than the all-purpose release they secured. This, then, was the situation. During the suit brought by the Beisers against Jamestown, the plaintiff testified. Undoubtedly her testimony related in substantial part to her own losses and injuries, for which she had received compensation from the Beisers and their insurers. The Beisers possessed plaintiff's release, giving them specific authority to release or dismiss with prejudice all causes of action arising out of the sinking of the Isle. Jamestown therefore was in a position, by settling with the Beisers, to foreclose the possibility of any additional lawsuits -- and, accordingly, made payment of $300,000. Now, over two years later, plaintiff seeks to unscramble what has not only been scrambled but digested. It may be that plaintiff would have been better served by filing claims contemporaneously against the Beisers and Jamestown, but there is no issue of overreaching in this case. Nor is this a case where an assignee paid for only a discrete -9- segment of a putative plaintiff's claims and received an assignment of all claims; here, plaintiff received payments covering all facets of her losses and injuries, including pain and suffering. And there is nothing in this record to indicate that the Beisers or their insurers received a windfall. We therefore hold that the district court did not err in its original ruling, dismissing plaintiff's suit. Reformation of the Release After dismissal of her action plaintiff moved under Fed. R. Civ. P. 59(e) to reconsider the ruling, again referring to the legality of the assignment, but adding the allegation that insurance agent Amato had induced her to execute the release through false representations. The district court granted a hearing solely to hear evidence and arguments concerning that issue. After observing that the matters raised in the hearing inexplicably had not been raised earlier, it concluded that plaintiff had not been misled, having been advised by Amato to seek legal advice. The court also rejected a new argument made at the hearing in which plaintiff sought, based on mutual mistake, to have the release reformed to assign her claims only up to the amount the Beisers had paid. The court ruled that, "[i]f there is any merit to this argument it is not addressed by the present action, since the Beisers are not the defendants." In reviewing the district court's decision on this post- judgment motion under Rule 59(e), we look only for abuse of discretion. United States v. Land at 5 Bell Rock Rd., 896 F.2d _____________ _______________________ -10- 605, 611 (1st Cir. 1990). Clearly there was no abuse. The court leaned over backward in granting a hearing on an issue that could have been raised earlier. When this issue evaporated, it patiently considered the contention that both plaintiff and Amato had intended that the release not foreclose her from suing Jamestown. Even though the written evidence strongly suggests that Amato sought to secure for his client all possible protection, it credited both plaintiff and Amato with so intending. What plaintiff seeks is most singular. In a suit against B, she wishes to restructure a contract she entered into with A. Were this to be allowed, an insurance adjuster could serve his client to the maximum, and then come into court and say, "I didn't mean what I drafted." In this case, such testimony would open the door both to a lawsuit Jamestown had paid heavily to avoid and to a substantial claim for contribution against the Beisers and their insurers which they in turn thought they had foreclosed by a substantial settlement. Plaintiff has not cited any persuasive authority allowing contracts to be reformed in this manner. Such authorities as McInnis v. Harley-Davidson _______ _______________ Motor Co., 625 F. Supp. 943, 948-49 (D.R.I. 1986), City of _________ ________ Cleveland v. Cleveland Electric Illuminating Co., 538 F. Supp. _________ ____________________________________ 1287, 1289 (N.D. Ohio, E.D. 1980), and Cram v. Northbridge, 410 ____ ___________ Mass. 800, 803, 575 N.E.2d 747 (1991), all deal with the substantive question of how to interpret a release secured by a single tortfeasor that purports "to acquit her and `all other -11- persons, firms or corporations,'" McInnis, 625 F. Supp. at 948.2 _______ We have found no instances of contract reformation in the absence of one party to the contract. Plaintiff argues in her brief, "Boat Yard was not a party to the Release in question, nor an intended beneficiary, nor has it changed its position in reliance on the Release. Therefore, reformation is in order." This reveals both an unrealistic view of the facts and a simplistic view of the law. For there is every reason to believe that Jamestown, in making payment of $300,000, did rely on the comprehensiveness of the release obtained from the Beisers. And reformation of contracts is not so easily "in order" when the party against whom it is being reformed is not present. See generally 3 A. Corbin, Corbin on ______________ _________ Contracts 598, at 588; 614, 615 (1960) (discussion of _________ reformation solely within context of litigation between the parties to a document). We see no abuse of discretion. AFFIRMED. ________ ____________________ 2 Judge Selya in McInnis noted three possible constructions of _______ such a broad discharge: (1) that a party is barred from proceeding against all tortfeasors, whether or not identified; (2) that a party is barred only from proceeding against others either named in the release or identifiable from the face of the document; and (3) that the discharge releases those persons, named or not, whom the parties intended to release. 625 F. Supp. at 948-49. -12-